RODERICK LAMAR HYMON, Appellant, *v.* THE STATE
OF NEVADA, Respondent.

No. 41378

May 26, 2005

111 P.3d 1092

[Rehearing denied July 26, 2005]

*Michael H. Schwarz,* Las Vegas, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,*
District Attorney, *James Tufteland,* Chief Deputy District Attorney,
and *Noreen C. Nyikos,* Deputy District Attorney, Clark County, for
Respondent.

Before ROSE, GIBBONS and HARDESTY, JJ.

## OPINION

By the Court, HARDESTY, J.:

During the guilt phase of the trial, appellant Roderick Lamar Hymon, who was representing himself, was required to wear an electronic stun belt as a result of his threat to kill the trial judge. On appeal, we address under what circumstances a defendant in a criminal trial may be required, as a security measure, to wear a remote-controlled electronic stun belt.

### *FACTS*

On April 8, 2001, Betty Crisman was alone in the lobby area of Chick's Tire & Auto Repair in Las Vegas when Hymon entered and walked to the counter. Hymon suddenly turned around and

grabbed Crisman's purse. Following a brief struggle, Hymon gained control of the purse and ran out the door. Crisman screamed that Hymon had stolen her purse.

Two of Chick's mechanics, Clyde Estabillo and Stanley "Red" Turner, were standing in the garage just on the other side of the lobby door and heard Crisman's scream. They saw Hymon running from the lobby with a purse under his arm and chased Hymon, catching him when he fell on the curb. Hymon stood up, swinging a four- to six-inch long pocketknife at his pursuers. Estabillo and Turner backed away, allowing Hymon to escape over a nearby fence.

Estabillo located two police officers, who caught and arrested Hymon. Estabillo and Crisman identified Hymon at the scene.

Hymon requested to represent himself in the district court proceeding. A few days after Hymon's request, the district court conducted a *Faretta*[1] canvass. The district court questioned Hymon on the topics listed in SCR 253 but omitted a question regarding whether Hymon understood the possible penalties or punishments. Hymon gave appropriate responses to all of the questions. Subsequently, the district court concluded that Hymon was competent to waive his right to counsel and he was doing so freely, voluntarily and knowingly. The district court appointed standby counsel.

A few months later, the prosecutor and standby counsel told the district court that Hymon was being uncooperative, and they were having problems communicating with him. Hymon became very agitated, and the district court revoked Hymon's right to represent himself and appointed new counsel.

Hymon's counsel eventually requested a psychological evaluation to determine Hymon's competence to stand trial. Hymon was removed from the courtroom after an unruly outburst. The district court ordered a psychological evaluation, but Hymon refused to see the psychologist. The psychologist recommended that Hymon be declared incompetent until a complete evaluation could be performed.

Hymon then moved to dismiss his counsel. The district court ordered another psychological evaluation. Several months later, Lake's Crossing declared Hymon competent to stand trial, but it noted that Hymon had an antisocial personality disorder.

At calendar call on November 27, 2002, Hymon claimed that he was being represented against his will and denied his right to self-representation. Hymon's counsel informed the court that he had attempted to see Hymon several times, but Hymon refused to meet. The district court continued the hearing and, upon reconvening, conducted another *Faretta* canvass.

---

[1] *Faretta v. California*, 422 U.S. 806 (1975).

The district court again questioned Hymon from the list in SCR 253. Hymon gave appropriate responses to all of the questions, but the district court was concerned with Hymon's understanding of his available defenses. Hymon stated that one of the main reasons he wanted to represent himself was because his counsel would not present the defense that Hymon wanted. Hymon explained that while the State had sufficient evidence to prove that he committed the robbery, his rights were violated in the justice court. Hymon argued that the jury should be informed of his constitutional rights, and he stated that he would argue that he had been denied due process and should be acquitted. The district court stated that Hymon was not articulating a viable defense. Finally, after much discussion, the district court stated that under SCR 253(4), it could not "in good conscience rubber-stamp these findings." The district court stated that it could not allow Hymon to represent himself. However, after an unrecorded bench conference, the district court stated, on the record, that this court has said that if the defendant is competent to stand trial, then the defendant must be allowed to represent himself. Accordingly, the district court allowed Hymon to represent himself but appointed standby counsel.

The jury was selected without incident on December 2, 2002. At some point during the day, before the jury returned to the courtroom, the district court sought confirmation that Hymon was not cuffed or in shackles. The corrections officer responded that Hymon was not, but he was wearing a stun belt. The district court responded, "He's been good. You want to keep him in the [stun] belt?" The corrections officer's reply was not audible, but the district court responded, "All right," and Hymon remained in the belt.

During his opening statements to the jury, Hymon focused on the violation of his rights during all of the proceedings. He opened his clothes and revealed the stun belt. Hymon told the jury that the district court placed him in the belt and if he does something that the bailiff does not like, he will be electrocuted. Hymon claimed that the district court was not impartial because it would not allow Hymon to present evidence.

At the end of the day and outside the jury's presence, the district court made a record of why it ordered Hymon to wear the stun belt. The district court stated that it received a copy of a letter that Hymon had written to the Civil Rights Volunteers of the Nevada Bar Association. The letter requested that the Civil Rights Volunteers make the district court judge recuse himself. The letter stated, "If I have to, I will murder him." A copy of the letter was provided to the district court. The district court told Hymon that this direct threat caused the district court to order Hymon to wear the belt. Hymon complained that the district court did not hold a hearing before ordering him to wear the belt. The district court re-

sponded that it need not hold a hearing upon receiving such a threat.

The next day, the State requested that the district court explain the belt to the jury. Hymon admitted to sending the letter; however, he again complained about the lack of a hearing. Hymon stated that the district court was not following the rules, and he complained that if he did anything combative, the belt would blow him up. The district court admitted that it should have shown Hymon the letter first. When the jury was brought in, the district court instructed the jury that the stun belt was a standard security procedure and that they should not draw any inferences from it concerning the defendant's character or propensity for violence.

After the jury returned a guilty verdict, Hymon requested counsel for sentencing, and the district court appointed the attorney who had served as standby counsel. The State advised the district court it had certified copies of Hymon's prior convictions. Hymon objected, claiming that some of the convictions could not be used for habitual criminal status and the State failed to previously provide him with copies. Hymon became hostile, and the district court had him removed from the courtroom.

Sentencing was continued two days later. The prosecutor stated, "I have in my hand the certified copies, and for the record, I have a certified copy of [five of Hymon's prior convictions]. May I approach, Judge, and have them marked?" The district court consented. Hymon questioned the number of prior convictions. The State provided Hymon with another copy of the convictions, and the district court trailed the proceedings so that Hymon could review them. Upon resuming the proceedings, Hymon successfully argued that one of the convictions was not valid for habitual criminal status, leaving four valid convictions. The district court found Hymon to be a habitual criminal. However, the State never requested to have the judgments of conviction admitted, and the district court never stated that they were admitted.

## DISCUSSION

On appeal, Hymon argues that the district court: (1) should have promptly disclosed that it received a copy of Hymon's letter and conducted a hearing before requiring him to wear a stun belt, (2) abused its discretion by allowing Hymon to represent himself after performing an inadequate *Faretta* canvass, and (3) erred by sentencing Hymon as a habitual criminal when the judgments of conviction were not admitted into evidence.[2]

---

[2]We conclude that Hymon's other arguments are without merit. First, there is sufficient evidence to show that Hymon committed the assault with a "dangerous and deadly weapon." The four- to six-inch pocketknife that Hymon used against Estabillo and Turner falls within the definition of "deadly

*Stun belt*

We take this opportunity to explain under what circumstances the district court may compel a defendant to wear a stun belt during the guilt phase of a trial.

A stun belt is a means of prisoner restraint. It is an electronic device that is secured around the prisoner's waist, arm or leg. It is generally worn beneath the defendant's shirt or jacket and is not visible to the jury. The belt, which may be activated remotely, delivers a high voltage electrical current throughout the defendant's body.[3] The record in this case does not address how activation of a stun belt, like that Hymon was required to wear, might affect the person wearing it. However, numerous cases provide a detailed discussion. These cases indicate that activation may cause incapacitation, severe pain, uncontrolled defecation or urination, muscular weakness, heartbeat irregularities or seizures.[4] In some cases, accidental activation has occurred.[5]

District courts are allowed sufficient discretion to determine whether to physically restrain a defendant during the guilt phase of a trial.[6] In making this determination, the district court must carefully balance the defendant's constitutional rights with the security risk that the defendant poses. A defendant should not be restrained except as a last resort.[7]

Restraining a defendant during trial raises several constitutional concerns. "A criminal defendant clearly has the right . . . to appear before his jurors clad in the apparel of an innocent person."[8] The sight of physical restraints may have a significant effect

---

weapon" in NRS 193.165. Second, we conclude that there is sufficient evidence to support Hymon's convictions for robbery and larceny. Third, we conclude that Hymon's argument regarding ineffective assistance of counsel must be raised in the district court by a post-conviction petition for a writ of habeas corpus. *Feazell v. State,* 111 Nev. 1446, 1449, 906 P.2d 727, 729 (1995). Finally, since Hymon never sought relief below for the justice court's bailiff's alleged threat to tape his mouth shut, we conclude that this issue has not been properly preserved for appeal.

[3]*See Gonzalez v. Pliler,* 341 F.3d 897, 899 (9th Cir. 2003) (describing how a stun belt works).

[4]*Id.*

[5]*Id.*

[6]*Illinois v. Allen,* 397 U.S. 337, 343 (1970); *McGervey v. State,* 114 Nev. 460, 463, 958 P.2d 1203, 1205-06 (1998).

[7]*Allen,* 397 U.S. at 344.

[8]*Grooms v. State,* 96 Nev. 142, 144, 605 P.2d 1145, 1146 (1980) (citations omitted).

on the jury by eroding the presumption of innocence, which is an integral part of the defendant's right to a fair trial.[9] Notably, the United States Supreme Court recently held that the Constitution forbids the use of visible shackles during the penalty phase of a capital proceeding, as well as during the guilt phase, unless the use is justified by an essential state interest, such as courtroom security that is specific to the defendant on trial.[10] However, this is less of a concern in the case of stun belts, as opposed to the more traditional forms of restraint such as handcuffs or shackles, since stun belts can be concealed beneath the defendant's clothes. Nevertheless, other constitutional concerns may be elevated by the use of a stun belt.

A stun belt poses the risk of interfering with the defendant's Sixth Amendment right to confer with counsel.[11] "The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial—including those movements necessary for effective communication with counsel."[12]

Another problem with a stun belt is its potentially adverse effect on the defendant's Sixth Amendment and due process rights to be present at trial and to participate in his defense.[13] The stun belt is "a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case."[14] "It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt."[15]

A stun belt may also adversely affect the defendant's "privilege of becoming a competent witness and testifying in his own behalf."[16] A stun belt likely increases the anxiety that a witness normally feels upon having to testify, which may affect the defendant's

---

[9]*Gonzalez,* 341 F.3d at 899-900; *U.S. v. Durham,* 287 F.3d 1297, 1304 (11th Cir. 2002); *Dickson v. State,* 108 Nev. 1, 3, 822 P.2d 1122, 1124 (1992).

[10]*Deck v. Missouri,* 544 U.S. 622, 624 (2005).

[11]*Durham,* 287 F.3d at 1305.

[12]*Id.*

[13]*Id.* at 1305-06.

[14]*Id.* at 1306.

[15]*Id.*

[16]*Gonzalez,* 341 F.3d at 900 (quotation marks and citation omitted).

demeanor on the stand.[17] Since many criminal trials rest on the credibility of the witnesses, the impact of the stun belt's effect on the defendant's testimony may be significant.

All of these concerns may be elevated in the case of a defendant who is representing himself. A self-representing defendant must intently focus on the proceedings so that he does not miss an issue or a possible objection. The stun belt may cause the defendant concern regarding voicing a vehement objection or actively cross-examining a witness, and it may distract the defendant's attention from the proceedings. Further, a self-represented defendant must be afforded the same freedom of movement within the well of the trial court as that enjoyed by the prosecutor.

It is for these reasons that the decision to use a stun belt is subjected to close judicial scrutiny.[18] We conclude, therefore, that the district court must conduct a hearing and determine whether an essential state interest, such as special security needs relating to the protection of the courtroom and its occupants or escape risks specific to the defendant on trial, is served by compelling the defendant to wear a stun belt.[19] As part of this determination, the district court must consider less restrictive means of restraint.[20] Additionally, the district court must: (1) make factual findings regarding the belt's operation, (2) address the criteria for activating the stun belt, (3) address the possibility of accidental discharge, (4) inquire into the belt's potential adverse psychological effects, and (5) consider the health of the individual defendant.[21] The district court's rationale must be placed on the record to enable this court to determine if the use of the stun belt was an abuse of discretion.[22] Furthermore, the decision must be made by the district court, not by law enforcement officers.[23] ''The use of physical restraints is subject to close *judicial,* not law enforcement, scrutiny. It is the duty of the [district] court, not correctional officers, to make the affirmative determination, in conformance with constitutional standards, to order the physical restraint of a defendant in the courtroom.''[24]

---

[17]*Id.* at 901.

[18]*Id.*; *Durham,* 287 F.3d at 1304.

[19]*Gonzalez,* 341 F.3d at 901; *Durham,* 287 F.3d at 1307; *see also Deck,* 544 U.S. at 633.

[20]*Gonzalez,* 341 F.3d at 901.

[21]*Durham,* 287 F.3d at 1307; *People v. Mar,* 52 P.3d 95, 97 (Cal. 2002).

[22]*Durham,* 287 F.3d at 1307.

[23]*Gonzalez,* 341 F.3d at 902; *Mar,* 52 P.3d at 105.

[24]*Gonzalez,* 341 F.3d at 902.

In order for the error in the trial process alleged by Hymon to be reversible, this court must conclude that it was not harmless beyond a reasonable doubt.[25] When it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error, the error is harmless.[26]

On appeal, Hymon focuses on the district court's failure to hold a hearing to disclose that it received a copy of Hymon's letter. Hymon argues that the district court violated NCJC Canon 3B(7), which prohibits the district court from considering third-party communications regarding a pending case. Hymon alleges that the district court was prejudiced against him because of the letter. We note that the district court did have an obligation to promptly disclose this third-party communication to Hymon and the State. Nevertheless, we conclude that the district court's error is harmless because Hymon's remedy upon being informed of the communication would have been to move to disqualify the district court judge, pursuant to NRS 1.235. Hymon did not do so upon learning of the communication, and even if he had, a district court judge is not required to recuse himself after receiving a threat from the defendant.[27]

Further, we believe the focus should be, as Hymon argued below, on the district court's failure to hold a hearing on the potential use of the stun belt. In this case, we conclude that the district court's failure to hold a hearing before ordering Hymon to wear a stun belt was harmless. Hymon claims that the jury, upon learning of the belt, must have believed that Hymon was being forced to wear it because he was dangerous and could not be trusted to conduct himself properly before the court. Hymon does not claim,

---

[25]*Manley v. State,* 115 Nev. 114, 122-23, 979 P.2d 703, 708 (1999).

[26]*Allred v. State,* 120 Nev. 410, 415, 92 P.3d 1246, 1250 (2004).

[27]*See Mayberry v. Pennsylvania,* 400 U.S. 455, 463 (1971) ("[W]e do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case."); *Standing Committee v. Yagman,* 55 F.3d 1430, 1443-44 (9th Cir. 1995) ("It has long been established, however, that a party cannot force a judge to recuse himself by engaging in personal attacks on the judge . . . ."); *Wilks v. Israel,* 627 F.2d 32, 37 (7th Cir. 1980) ("To permit [a deliberate attack] to cause a new trial before a new judge would encourage unruly courtroom behavior and attacks on the trial judge and would greatly disrupt judicial administration."); *accord U.S. v. Malmsberry,* 222 F. Supp. 2d 1345, 1349-50 (M.D. Fla. 2002); *Smith v. District Court for Fourth Judicial Dist.,* 629 P.2d 1055, 1057 (Colo. 1981); *State v. Brown,* 825 P.2d 482, 489 (Idaho 1992); *State v. Prater,* 583 So. 2d 520, 527-28 (La. Ct. App. 1991); *State v. Bilal,* 893 P.2d 674, 675-77 (Wash. Ct. App. 1995).

however, that the belt affected his demeanor during the trial or that it implicated his constitutional rights.

Furthermore, the district court instructed the jury that the stun belt was a standard security procedure and that they should not draw any inferences from it concerning the defendant's character or propensity for violence. We must presume that the jury followed that instruction.[28] Finally, if any prejudice resulted from the jury learning of the stun belt, it was caused by Hymon's own actions. If Hymon had not opened his clothing during his opening statement, the jury would never have known that Hymon was wearing a stun belt.

A review of the trial transcripts indicates that, while the district court sought input from the corrections officer regarding whether Hymon should continue to wear the belt, the district court ultimately made the decision to keep Hymon in the belt.

The record also reveals that Hymon posed a substantial security risk in the courtroom. On several occasions, Hymon had to be removed from the courtroom due to an outburst or uncontrollable behavior. Furthermore, Hymon's letter, which he admits authoring, contained a direct threat to the district court judge who was sitting on the case. A direct threat to the life of the judge or the court's staff constitutes a sufficient state interest to warrant the use of restraints, such as a stun belt, in the courtroom. Therefore, we conclude that the record sufficiently demonstrates that an essential state interest was served by compelling Hymon to wear a stun belt and that the district court's failure to hold a hearing constitutes harmless error.

## Faretta canvass

Hymon contends that the district court abused its discretion by failing to conduct a specific, penetrating and comprehensive *Faretta* canvass before granting Hymon the right to represent himself. Hymon argues that the district court failed to adequately inquire into four of the areas mentioned in SCR 253(3): Hymon's mental health, his understanding of the elements of the crimes, his understanding of the punishments and total possible sentence, and his understanding of the possible pleas and defenses available. The State counters that the district court conducted two complete and detailed *Faretta* canvasses, after which the district court found that Hymon was competent to stand trial and that he was waiving his right to counsel freely and voluntarily.

---

[28]*See Lisle v. State,* 113 Nev. 540, 558, 937 P.2d 473, 484 (1997) ("There is a presumption that jurors follow jury instructions."), *clarified on other grounds,* 114 Nev. 221, 954 P.2d 744 (1998).

The United States and Nevada Constitutions guarantee a defendant the right to self-representation.[29] Denial of that right is per se reversible error.[30] However, before allowing a defendant to waive counsel and represent himself, the trial court must ensure that the defendant is competent and that the waiver of counsel is knowing, voluntary, and intelligent.[31] The competency to stand trial is the same competency needed to waive the right to counsel.[32] Once a defendant is deemed competent, the next inquiry is whether the waiver of counsel is knowing, voluntary and intelligent.[33] "[W]hen a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted."[34]

The court should conduct a *Faretta* canvass to apprise "the defendant fully of the risks of self-representation and of the nature of the charged crime so that the defendant's decision is made with a 'clear comprehension of the attendant risks.' "[35] SCR 253(2) states that during the *Faretta* canvass the district court should inform the defendant of some of the dangers, disadvantages and consequences of self-representation and lists specific warnings that the district court should offer. SCR 253(3) states that the district court's canvass *may* include questions about the defendant personally and about the defendant's knowledge and understanding of the proceedings against him. Finally, SCR 253(4) states that the district court shall make findings on the record concerning the defendant's competency to waive counsel and whether the defendant is waiving his right freely, voluntarily and knowingly.

This court has "rejected the necessity of a mechanical performance of a *Faretta* canvass. Even the omission of a canvass is not reversible error if 'it appears from the whole record that the defen-

---

[29]*Wayne v. State,* 100 Nev. 582, 584, 691 P.2d 414, 415 (1984).

[30]*McKaskle v. Wiggins,* 465 U.S. 168, 177 n.8 (1984).

[31]*Faretta,* 422 U.S. at 835; *see also Godinez v. Moran,* 509 U.S. 389, 400-01 (1993).

[32]*Godinez,* 509 U.S. at 399.

[33]*Johnson v. State,* 117 Nev. 153, 164, 17 P.3d 1008, 1016 (2001).

[34]*Godinez,* 509 U.S. at 402.

[35]*Johnson,* 117 Nev. at 164, 17 P.3d at 1016 (citing *Tanksley v. State,* 113 Nev. 997, 1001, 946 P.2d 148, 150 (1997) (quoting *Graves v. State,* 112 Nev. 118, 124, 912 P.2d 234, 238 (1996))).

dant knew his rights and insisted upon representing himself.' ''[36] In *Graves v. State,* we explained:

> To the extent that any of our prior cases hint that specific matters should be part of a canvass that go beyond the general requirements of *Faretta,* we note that those specific matters are not constitutionally required for a valid waiver where it is apparent from the record that the defendant was aware of the dangers and disadvantages of self-representation.[37]

This court will give deference to the district court's decision to allow the defendant to waive his right to counsel.[38] ''Through face-to-face interaction in the courtroom, the trial judges are much more competent to judge a defendant's understanding than this court. The cold record is a poor substitute for demeanor observation.''[39]

First, Hymon contends that the district court abused its discretion by allowing Hymon to represent himself, knowing that: (1) it previously ordered Hymon to undergo a psychological evaluation, (2) Lake's Crossing diagnosed Hymon as having an antisocial personality disorder, and (3) Hymon was unable to maintain his decorum in the courtroom. The State contends that there was never any indication that Hymon was mentally incompetent.

SCR 253(3)(c) states that the district court's canvass may include inquiry into the defendant's mental health history. A defendant may be denied the right to represent himself if a physical or mental impairment, even if not enough to render the defendant incompetent to stand trial, renders the defendant unable to abide by rules of procedure or protocol.[40]

During the *Faretta* canvasses, the district court inquired into Hymon's mental health and Hymon responded that he was sane and had never been treated for any sort of mental illness. The record indicates that the district court ordered the psychological evaluation because Hymon was not cooperating with his counsel and refused to see the first psychologist. Lake's Crossing indicated

---

[36]*Graves,* 112 Nev. at 125, 912 P.2d at 238 (quoting *Wayne,* 100 Nev. at 585, 691 P.2d at 416).

[37]*Id.* at 125, 912 P.2d at 238-39.

[38]*Id.* at 124, 912 P.2d at 238.

[39]*Id.*

[40]*Johnson,* 117 Nev. at 166-67, 17 P.3d at 1017.

that Hymon was in good mental health, despite having an antisocial personality disorder. The record shows that Hymon was capable of abiding by the rules of procedure and protocol and was able to use them to his advantage when appropriate. Accordingly, we conclude that the district court adequately inquired into Hymon's mental health when performing the *Faretta* canvass.

Second, Hymon contends that while he answered that he knew the elements of the offenses that he was charged with, he could not have stated them upon further inquiry. SCR 253(3)(f) states that the district court's canvass may include an inquiry into the "[d]efendant's understanding of the elements of each crime and lesser included or related offenses."

Hymon told the district court that he had attended approximately eleven preliminary hearings and six trials, including one for robbery with use of a deadly weapon, and had done a lot of legal reading while in prison. We conclude that the record repeatedly demonstrates that Hymon had significant legal knowledge of the crimes with which he was charged and had significant similar criminal experience. The district court adequately inquired into Hymon's knowledge regarding the elements of the offenses.

Third, Hymon argues that he did not understand that he could be sentenced as a habitual criminal and receive up to five life sentences. SCR 253(3)(g) states that the district court's canvass may include an inquiry into the "[d]efendant's understanding of the possible penalties or punishments, and the total possible sentence the defendant could receive." The record indicates that the sentences were explained several times to Hymon, and he independently filed a motion for discovery under the habitual criminal act.

Finally, Hymon contends that the district court failed to adequately inquire into his understanding of the possible defenses. Hymon indicated that he erroneously wished to base his defense on alleged violations of his constitutional rights, and he intended to do so by calling various court officials to testify regarding the relevant law.

SCR 253(3)(h) states that the district court's canvass may include an inquiry into the "[d]efendant's understanding of the pleas and defenses which may be available." "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails."[41] The standard of competency for a defendant to choose his own defense is the same level of competency needed to stand trial.[42] The law requires that the defen-

---

[41]*Faretta,* 422 U.S. at 819-20.

[42]*Johnson,* 117 Nev. at 164, 17 P.3d at 1015.

dant be competent *and* that the waiver is knowing, voluntary and intelligent.

We agree that the record seems to indicate that the district court was under the mistaken impression that if the defendant is competent to stand trial, then no further inquiry is required in regards to whether the waiver is knowing, voluntary and intelligent. However, we conclude that the record indicates that Hymon understood his possible defenses. In an attempt to rebut the essential elements of the crimes, Hymon competently cross-examined the witnesses, presented jury instructions and argued that the State failed to establish its case. These maneuvers demonstrate that Hymon understood and was capable of pursuing his viable defenses.

Accordingly, the record demonstrates that the district court conducted a specific, penetrating and comprehensive *Faretta* canvass. Furthermore, the record supports that Hymon was competent to waive his right to counsel and that his waiver was knowing, voluntary and intelligent.

### *Habitual criminality*

Hymon argues that the district court erred by sentencing him as a habitual criminal because the certified copies of his judgments of conviction were not properly admitted into evidence. Hymon contends that the convictions were not before the court because, while they were introduced and marked, the district court never admitted them.

NRS 207.016(3) provides:

> If a defendant charged pursuant to NRS 207.010, 207.012 or 207.014 pleads guilty to or is found guilty of the primary offense but denies any previous conviction charged, the court shall determine the issue of the previous conviction after hearing all relevant evidence presented on the issue by the prosecution and the defendant.

For the defendant to be sentenced as a habitual criminal, the State must prove the defendant's prior convictions beyond a reasonable doubt.[43] "[A] certified copy of a felony conviction is prima facie evidence of conviction of a prior felony."[44]

We conclude that Hymon's argument is without merit. While the better practice is for the district court to clearly enunciate that ev-

---

[43]*Hollander v. State,* 82 Nev. 345, 349-50, 418 P.2d 802, 804 (1966).

[44]NRS 207.016(5).

idence has been admitted, other courts have recognized that the failure to do so is not fatal.[45] " 'It is not indispensable that an exhibit be offered and admitted in evidence by any precise words.' "[46]

In this case, it is unclear whether the certified copies of Hymon's judgments of conviction were admitted into evidence because the district court did not specifically state that they were. Nevertheless, the documents were received into evidence, the parties argued them, and based on certified copies of Hymon's judgments of conviction, the district court determined that Hymon qualified as a habitual criminal. The copies were marked. The State presented Hymon with copies, and the district court trailed the proceedings so that Hymon could review them. Upon reconvening, Hymon not only objected to the evidence, but he also successfully argued against the validity of one of the convictions. The district court clearly considered the documents when it sentenced Hymon as a habitual criminal. The vault exhibit form shows that four certified copies of judgments of conviction were offered and admitted. Furthermore, on appeal, Hymon does not dispute the validity of the four judgments of conviction. Accordingly, the district court did not err by determining that Hymon qualified as a habitual criminal and sentencing Hymon as such.

## CONCLUSION

We conclude that the district court's failure to hold a hearing before ordering Hymon to wear a stun belt constitutes harmless error. However, we note that, in the future, the district courts must hold a hearing in accordance with the guidelines established in this opinion before ordering a defendant to wear a stun belt. Additionally, the district court did not abuse its discretion by allowing Hymon to exercise his constitutional right to represent himself after conducting two thorough *Faretta* canvasses. Finally, we conclude that, even though the district court did not state that Hymon's prior judgments of conviction had been "admitted" into evidence, the district court did not err by sentencing Hymon as a habitual criminal. Accordingly, we affirm Hymon's convictions for robbery with the use of a deadly weapon, larceny from a person and assault with a deadly weapon and his sentences under the habitual criminal statute.

Rose and Gibbons, JJ., concur.

[45]*See Zimmerman v. Chicago Bd. of Trade,* 360 F.3d 612, 622 (7th Cir. 2004); *Morris v. State,* 477 A.2d 1206, 1216 (Md. Ct. Spec. App. 1984); *Com. v. Nicolella,* 452 A.2d 1055, 1056 (Pa. Super. Ct. 1982); *Gee v. Lewisville Memorial Hosp., Inc.*, 849 S.W.2d 458, 461 (Tex. Ct. App. 1993).

[46]*Zimmerman,* 360 F.3d at 622 (quoting *Hastings v. Reynolds Metals Co.,* 165 F.2d 484, 486 (7th Cir. 1947)).