ANTHONY TYRELL NELSON, APPELLANT, v.
THE STATE OF NEVADA, RESPONDENT.

No. 46353

November 8, 2007 170 P.3d 517

---

[Rehearing denied February 25, 2008]

*Philip J. Kohn*, Public Defender, and *Sharon G. Dickinson*, Deputy Public Defender, Clark County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, and *James Tufteland*, Chief Deputy District Attorney, Clark County, for Respondent.

Before the Court En Banc.

## OPINION

By the Court HARDESTY, J.:

In this appeal, we consider the constitutionality of NRS 484.348(3)(b), which prohibits drivers from operating a motor vehicle in such a manner as to endanger other persons or property while fleeing a police officer who has signaled for the driver to stop. Appellant Anthony Tyrell Nelson contends that the term "endangers" as contained in NRS 484.348(3)(b) is vague. Although NRS 484.348(3)(b) does not define specific acts that are prohibited under the statute, we conclude that the statute is not unconstitutionally vague because individuals of ordinary intelligence can easily discern whether their operation of a vehicle while fleeing from a police vehicle places life or property in danger. Further, we determine that Nelson's additional claims are without merit. We therefore affirm the district court's judgment of conviction.

### PROCEDURAL HISTORY AND FACTS

Carolyn Paquette and her friends, Jason Minkler and Alisha Chugg, were driving to Paquette's condominium after spending the evening at a club. As they entered Paquette's gated community, the group noticed that another vehicle followed them into the community before the gates closed. Minkler stopped the vehicle in front of Paquette's condominium; Paquette exited the vehicle and approached the door to her home.

A black two-door vehicle with a red stripe and two people inside stopped behind Paquette. A man quickly exited the vehicle, approached Paquette, and demanded her purse. Paquette asked the man if he was kidding. The man replied that he was not kidding and held a handgun in front of Paquette's face.

Minkler and Chugg exited their vehicle. Chugg ran towards the man and inquired what was happening, but turned around and returned to her vehicle when the man displayed the gun to her. Minkler approached the man, pulled out his cell phone, and began dialing 911. After taking Paquette's purse, the gunman and the driver quickly drove out of the complex.

Shortly after the incident, an officer arrived at the scene and obtained statements from Paquette, Minkler, and Chugg. At trial, the officer testified that when he interviewed Minkler he did not notice the smell of alcohol on Minkler's breath and Minkler did not appear to be intoxicated. The officer testified that Paquette had been drinking that evening, but that she did not appear to be "overly intoxicated." The officer also testified that Chugg had been drinking and appeared to be heavily intoxicated.

About 20-25 minutes after Paquette's purse was stolen, Officer Francis Shipp located a black Thunderbird with a red stripe parked on the shoulder of Boulder Highway that matched the description

given by Minkler. Officer Shipp made a U-turn and positioned his vehicle almost three feet behind the Thunderbird when the vehicle began moving north on Boulder Highway. Officer Shipp then followed the Thunderbird with his lights off because he was alone and the vehicle was reportedly involved in an armed robbery. The Thunderbird eventually exited Boulder Highway and gradually increased its speed to between 40 and 60 miles per hour as it traveled through housing developments. During this time, Officer Shipp reported to police dispatch that he was following a vehicle matching the description of the one used in Paquette's purse robbery, and he requested assistance.

The Thunderbird re-entered Boulder Highway traveling northbound when extra patrol cars joined the pursuit with lights and sirens activated. Officer Shipp recognized that he now had assistance so he activated his lights and sirens. However, the Thunderbird did not yield. Officer Shipp accelerated to approximately 90 miles per hour but was unable to keep pace with the Thunderbird. Another police vehicle, driven by Officer Jonathan Boucher, passed Officer Shipp as they both continued to pursue the Thunderbird. The Thunderbird proceeded to speed through two red lights before turning onto a road that terminated in a fence, which was erected at the edge of a construction site.

By the time Officer Shipp had stopped his vehicle, Officer Boucher had his gun drawn on Mathew Neifeld who was standing near the passenger side of the Thunderbird and Nelson who was lying on the ground near the driver side. The officers arrested both Nelson and Neifeld. During the arrest, Officer Boucher found a stocking in the front right pocket of Neifeld's pants. A search of the car recovered Paquette's cell phone, Paquette's credit card, and three sets of black gloves. After the arrest, Officer Shipp retraced the path the Thunderbird traveled after he pulled his vehicle behind it. Officer Shipp searched for a discarded weapon, but never found one.

Nelson was later tried by a jury and found guilty of count 1—conspiracy to commit robbery, count 2—robbery with the use of a deadly weapon, and count 3—failure to stop on signal of a police officer, a violation of NRS 484.348(3)(b). The district court sentenced Nelson for count 1, to a minimum of 60 months and a maximum of 190 months; for count 2, to life with the possibility of parole after serving 120 months;[1] and for count 3, to a minimum of 60 months and a maximum of 190 months. All counts are to run concurrently. Nelson appeals the judgment of conviction.

---

[1] The court did not impose consecutive sentences for the deadly weapon enhancement as alleged in count 2 because Nelson was sentenced as a habitual criminal. *Odoms v. State*, 102 Nev. 27, 34, 714 P.2d 568, 572 (1986) (holding that the district court may enhance a sentence for the use of a deadly weapon or under the habitual criminal statute, but not both).

## DISCUSSION

### NRS 484.348(3)(b) is not unconstitutionally vague

Nelson argues that the conviction for "failure to stop" under NRS 484.348(3)(b) is constitutionally unfair. NRS 484.348(1) makes it a crime for the driver of a motor vehicle to fail to stop or otherwise flee from a police officer when signaled to stop:

> [T]he driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a peace officer in a readily identifiable vehicle of any police department or regulatory agency, when given a signal to bring his vehicle to a stop is guilty of a misdemeanor.

The offense becomes a felony under NRS 484.348(3)(b) when, in addition to failing to stop when signaled, the driver "[o]perates the motor vehicle in a manner which endangers or is likely to endanger any person other than himself or the property of any person other than himself." Specifically, Nelson argues that the term "endangers" in NRS 484.348(3)(b) is unconstitutionally vague because the term is not defined and is inadequate to give a person fair notice of what conduct is prohibited or to restrain arbitrary enforcement of the statute. We disagree.

The constitutionality of a statute is reviewed by this court de novo.[2] In addition, statutes enjoy a presumption of validity, and the challenger has the burden of demonstrating their unconstitutionality.[3]

A statute is void for vagueness and therefore repugnant to the Due Process Clause of the Fourteenth Amendment if it fails to sufficiently define a criminal offense such that a person of ordinary intelligence would be unable to understand what conduct the statute prohibits.[4] In addition, a statute is unconstitutionally vague if it encourages arbitrary and discriminatory enforcement because it lacks specific standards.[5] However, "a statute will be deemed to have given sufficient warning as to proscribed conduct when the words

[2]*Zabeti v. State*, 120 Nev. 530, 534, 96 P.3d 773, 775 (2004).

[3]*State v. Colosimo*, 122 Nev. 950, 954, 142 P.3d 352, 355 (2006); *Williams v. State*, 118 Nev. 536, 546, 50 P.3d 1116, 1122 (2002).

[4]*Colosimo*, 122 Nev. at 954, 142 P.3d at 355; *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Sheriff v. Burdg*, 118 Nev. 853, 857, 59 P.3d 484, 486-87 (2002); *Woofter v. O'Donnell*, 91 Nev. 756, 762, 542 P.2d 1396, 1400 (1975).

[5]*Colosimo*, 122 Nev. at 954, 142 P.3d at 355.

utilized have a well settled and ordinarily understood meaning when viewed in the context of the entire statute."[6] Although "there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls," such a limitation is not sufficient to determine that a criminal statute is unconstitutional.[7]

Although several states have determined that similarly worded statutes are indefinite and vague, a majority have determined that the term "endangerment" is sufficiently specific to withstand constitutional scrutiny.[8] For example, in *State v. Sarriugarte*, the Oregon Court of Appeals rejected a constitutional challenge to an Oregon statute that proscribed driving a vehicle " '*in a manner that endangers or would be likely to endanger any person or property.*' "[9] The court determined that this statutory language is "at least as informative about the conduct it proscribes and at least as capable of objective adjudicative application as are many standard civil or criminal jury instructions, *e.g.*, those relating to negligence, recklessness and certain culpable mental states."[10] Upon review of a similar statute, the Supreme Judicial Court of Maine held that when the statute is read to include as an element criminal negligence, which is defined as the lowest culpable state of mind, the statute withstands constitutional scrutiny.[11] Finally, when addressing this issue, the New Jersey Supreme Court recognized that

---

[6]*Williams*, 118 Nev. at 546, 50 P.3d at 1122; *see also Colosimo*, 122 Nev. at 954, 142 P.3d at 355.

[7]*United States v. Petrillo*, 332 U.S. 1, 7 (1947).

[8]Judy E. Zelin, Annotation, *Statute Prohibiting Reckless Driving: Definiteness and Certainty*, 52 A.L.R. 4th 1161 (1987). *Compare State v. Pigge*, 322 P.2d 703, 704-05 (Idaho 1957) (determining that language analogous to NRS 484.348(3)(b) is unconstitutional because it fails to identify any general or specific act or acts that are prohibited), *State v. Huffman*, 275 N.W.2d 838, 840 (Neb. 1979) (holding that a statute prohibiting the operation of a motor vehicle in such a manner as to likely endanger persons or property is open to conjecture and unconstitutionally vague), *and People v. Firth*, 146 N.E.2d 682, 683-84 (N.Y. 1957) (determining that a prohibition against driving at speeds that endanger life, limb, or property is meaningless because a motor vehicle driven at any speed creates such a risk), *with State v. Thurston*, 293 A.2d 770, 771-72 (N.H. 1972) (recognizing that although it is impossible for some crimes to be defined with mathematical preciseness, a crime may be properly defined by the well-known terms "reckless" and "endanger"), *State v. Joas*, 168 A.2d 27, 31 (N.J. 1961) (determining that similar endangerment language expressed "ideas which find adequate interpretation in common usage and understanding" and was not unconstitutionally vague), *and State v. Sarriugarte*, 674 P.2d 82, 83 (Or. Ct. App. 1984) (determining that such language is as informative and capable of adjudicative application as are many jury instructions).

[9]674 P.2d at 82 (quoting Or. Rev. Stat. § 487.235(1) (1977) (repealed 1983)).

[10]*Id.* at 83.

[11]*State v. Davis*, 398 A.2d 1218, 1219 (Me. 1979).

" '[w]here the legislative regulatory object is appropriate and the conduct intended to be prohibited is not fairly susceptible of definition in other than general language, there is no constitutional impediment to its use.' "[12] We are persuaded by the majority position.

To violate NRS 484.348(3)(b), an individual first must flee from a police officer who is signaling the individual to stop his vehicle. Next, the individual must operate his vehicle in such a manner that it endangers or is likely to endanger other persons or property.

The term "endangers," as used in NRS 484.348(3)(b), is not unconstitutionally vague when considered in the context of the entire statute. The statute gives fair notice to people of ordinary intelligence that an individual is committing a felony when he or she drives in such a manner as to endanger persons or property while fleeing from a police vehicle with its lights and sirens activated. Although innumerable specific acts could be listed that would constitute felonious behavior under this statute, the statute provides clear guidelines for an adjudicative body to determine whether a violation has occurred. Additionally, an individual of average intelligence could easily discern whether he is endangering another person or property while fleeing a pursuing police vehicle. As the Supreme Judicial Court of Massachusetts stated in *Commonwealth v. Pentz*, "[t]o endanger the lives and safety of the public by the operation of an automobile on a public way is not an intangible and shadowy act. It has specific relation to possible contact with human beings."[13] Thus, we determine that NRS 484.348(3)(b) is not unconstitutionally vague.

*The State presented sufficient evidence that Nelson operated his vehicle in a manner that endangered or was likely to endanger the life or property of another while fleeing from a police officer who had signaled him to stop*

Nelson also argues that the State failed to establish that he endangered or was likely to endanger any person other than himself or the property of any person other than himself. We disagree.

The State presented evidence that Nelson failed to stop on the signal of a police officer and fled from the officer while speeding in excess of 90 miles per hour through red traffic lights. The jury could reasonably infer from this evidence that Nelson operated his vehicle in a manner that endangered or was likely to endanger the lives or property of others while fleeing from a police officer who

---

[12]*Joas*, 168 A.2d at 31 (quoting *State v. New York Central Railroad Company*, 116 A.2d 800, 803 (N.J. Super. Ct. App. Div. 1955)); *see also Petrillo*, 332 U.S. at 7.

[13]143 N.E. 322, 324 (Mass. 1924).

had signaled him to stop.[14] The violation of a traffic signal indicating that a stop is required—at speeds in excess of 90 miles per hour—clearly creates the potential for violent contact with human beings and other vehicles. Thus, we conclude that the State proved beyond a reasonable doubt that Nelson endangered other lives and property in violation of NRS 484.348(3)(b).[15]

*The fact that a juror is the victim in an unrelated pending case being prosecuted by the same office prosecuting the defendant does not, by itself, cause that juror's disqualification*

Nelson argues that the district court erred by not excluding a veniremember who allegedly had a close relationship with the Clark County District Attorney's Office. In particular, Nelson complains that the veniremember was a victim in an unrelated identity theft case that the Clark County District Attorney's Office was prosecuting. According to Nelson, this relationship between a veniremember and a party in the case is a ground for a challenge for cause. Although Nelson chose not to challenge the veniremember for cause, Nelson now contends that the district court erred by not excluding the veniremember on its own motion.

This issue was not preserved for appeal, so we must determine whether the error is plain and affected Nelson's substantial rights. "To be plain, an error must be so unmistakable that it is apparent from a casual inspection of the record."[16] As a general rule, an appellant must demonstrate that the error was prejudicial in order to prove that it affected his substantial rights.[17]

The test for determining if a veniremember should be removed for cause is whether a veniremember's views " ' "would prevent or substantially impair the performance of his duties as a juror in ac-

---

[14]*See Origel-Candido v. State*, 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998) (explaining that in resolving a challenge to the sufficiency of the evidence to support a jury verdict, this court views the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt).

[15]Nelson also contends he was deprived of the right to due process because the information did not contain any facts to support the "endangering" element. We reject this argument because Nelson was not prejudiced by any lack of specificity in the information. *See Watkins v. Sheriff*, 87 Nev. 233, 236, 484 P.2d 1086, 1088 (1971). In particular, the record reflects that Nelson was made aware of the specific details proving the endangering element during a preliminary hearing.

[16]*Garner v. State*, 116 Nev. 770, 783, 6 P.3d 1013, 1022 (2000), *overruled on other grounds by Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002).

[17]*See Gallego v. State*, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001).

cordance with his instructions and his oath.' ''[18] Additionally, this court has concluded that whether a juror should be disqualified is a question of fact for the trial judge.[19]

The question, then, is whether the fact that the State was prosecuting an unrelated criminal case in which the veniremember was the victim leads to the conclusion that the veniremember could not adjudicate the facts fairly. The record does not support such a conclusion.

During voir dire, the district court asked the veniremember, "Do you know of any reason at all why you cannot be completely fair and completely impartial in hearing this matter?" The veniremember responded, "Absolutely not." The district court then questioned the veniremember thoroughly concerning her ability to perform her duties and determined that her answers did not reveal that she was biased. Given this record, we conclude that the district court did not err by failing to sua sponte excuse the veniremember for cause.[20]

*The use of leg restraints during jury selection did not cause error*

Nelson argues that the use of leg bracelets, which may have been visible to at least one juror, undermined the presumption of innocence and interfered with his ability to communicate with counsel. Nelson also contends that because he was in shackles and his co-defendant was not, the jury was given the impression that he was more dangerous than his codefendant.

During the first day of jury selection, Nelson entered the courtroom in leg bracelets before the prospective jurors entered the courtroom. Nelson objected to the use of leg bracelets during trial because the jurors would likely be able to see and hear them. The district court overruled Nelson's objection and stated that "the indication is that he has quite a criminal record" and "I don't know how the jury is going to see [the leg bracelets] as long as they stay under the table."

Prior to the second day of jury selection, Nelson reiterated his objection to the leg bracelets and moved for a mistrial because, according to Nelson's attorney, juror number 7 was "at one point gazing down at Mr. Nelson's bracelets." The district court again stated that if Nelson wanted to hide the bracelets under the table,

---

[18]*Weber v. State*, 121 Nev. 554, 580, 119 P.3d 107, 125 (2005) (quoting *Leonard*, 117 Nev. at 65, 17 P.3d at 405), *cert. denied*, 546 U.S. 1216 (2006); *see also* NRS 175.036(1).

[19]*Hall v. State*, 89 Nev. 366, 371, 513 P.2d 1244, 1247 (1973).

[20]*See id.* at 370-71, 513 P.2d at 1247 (concluding that the fact that a juror was the victim of a burglary did not require removal of a juror whose voir dire answers demonstrated she was unbiased).

he could have. The district court then inquired of Court Services why the leg bracelets were necessary. Notably, the district court even admitted that it was not aware of Nelson's record. Court Services responded that Nelson was not dangerous. The court then sustained Nelson's objection and had the leg bracelets removed but denied the motion for a mistrial.

This court has recognized that a defendant has the right to appear before the jury in the clothing of an innocent person because "[t]he presumption of innocence is incompatible with the garb of guilt."[21] The garb of guilt necessarily includes physical restraints as such restraints, like prison clothing, erode the presumption of innocence.[22] Thus, as this court has acknowledged, the use of visible restraints during trial is unconstitutional unless "justified by an essential state interest, such as courtroom security that is specific to the defendant."[23] "District courts are allowed sufficient discretion to determine whether to physically restrain a defendant during the guilt phase of a trial" after "carefully balanc[ing] the defendant's constitutional rights with the security risk that the defendant poses."[24] That balance requires that a defendant be restrained only "as a last resort."[25] If the district court fails to balance the appropriate considerations or abuses its discretion in ordering that the accused be restrained during trial, this court must reverse the conviction unless the error was harmless beyond a reasonable doubt.[26]

In this case, the district court erred when it denied Nelson's request to have the leg bracelets removed on the first day of jury selection because the court failed to weigh the defendant's constitutional rights with any security risk. We conclude, however, that the error was harmless. Despite defense counsel's representations, there is no evidence in the record that any juror actually saw Nelson wearing the leg bracelets. And Nelson was not made to walk in front of the jury wearing the bracelets. Indeed, Nelson was free to keep the bracelets hidden under the table during the jury selection process. Thus, we conclude that it is clear beyond a rea-

---

[21]*Grooms v. State*, 96 Nev. 142, 144, 605 P.2d 1145, 1146 (1980); *see also Estelle v. Williams*, 425 U.S. 501, 504-05 (1976) (holding that state cannot, consistent with due process and equal protection, require an accused to stand trial while wearing identifiable prison clothes).

[22]*Hymon v. State*, 121 Nev. 200, 207-08, 111 P.3d 1092, 1098 (2005).

[23]*Id.* at 208, 111 P.3d at 1098 (citing *Deck v. Missouri*, 544 U.S. 622 (2005)).

[24]*Id.* at 207, 111 P.3d at 1098.

[25]*Id.*

[26]*Id.* at 210, 111 P.3d at 1099; *Grooms*, 96 Nev. at 144, 605 P.2d at 1146.

sonable doubt that the limited use of the leg bracelets during the first day of jury selection constituted harmless error.[27]

*Nelson was not entitled to eight peremptory challenges*

Nelson contends that the district court violated his right to due process and equal protection by denying him eight peremptory challenges. Relying on our decision in *Morales v. State*,[28] Nelson argues that he was entitled to eight peremptory challenges because he was facing the possibility of life imprisonment as a result of the habitual criminal allegation.[29] In contrast, the State argues that a defendant is entitled to eight peremptory challenges when the primary offense charged carries a sentence of life imprisonment or death. We agree with the State that the number of peremptory challenges allowed to a defendant depends on the sentence he faces if convicted of the primary offense, not the sentence he faces if adjudicated as a habitual criminal.

This court reviews questions of statutory construction de novo.[30] We previously have interpreted NRS 175.051(1) in the context of habitual criminal proceedings. In our 1981 decision in *Schneider v. State*, this court focused on the statute's reference to the "offense charged" and concluded that because adjudication is a status determination rather than a separate offense, habitual criminal proceedings do not control the number of peremptory challenges allowed under NRS 175.051(1).[31] Consistent with *Schneider*, Nelson would not be entitled to eight peremptory challenges under NRS 175.051(1) because none of the offenses charged—conspiracy to commit robbery, robbery, and felony failure to stop—carried the possibility of a life sentence.[32]

---

[27]Nelson also argues that the error caused by potential jurors viewing Nelson in leg bracelets is compounded by the fact that during trial, the State displayed a picture of Nelson in handcuffs sitting in a police car. However, we determine that this argument is without merit. The use of the picture was not prejudicial because the picture did not actually depict Nelson wearing restraints and the jury would learn during trial that Nelson had been arrested.

[28]116 Nev. 19, 992 P.2d 252 (2000).

[29]*See* NRS 175.051(1) ("If the offense charged is punishable by death or by imprisonment for life, each side is entitled to eight peremptory challenges."); *see also* NRS 207.010.

[30]*Zabeti v. State*, 120 Nev. 530, 534, 96 P.3d 773, 775 (2004).

[31]97 Nev. 573, 574-75, 635 P.2d 304, 304-05 (1981) ("adjudication under the habitual criminal statute constitutes a status determination and not a separate offense").

[32]*See* NRS 200.380; NRS 199.480; NRS 484.348.

Nelson invites us to revisit our holding in *Schneider* and relies on this court's holding in *Morales* as support for the proposition that he was entitled to eight peremptories because, as a result of the habitual criminal allegations, he faced a life sentence for the charged offenses. We decline to overrule *Schneider*. And we conclude that Nelson's reliance on *Morales* is misplaced because it did not address habitual criminal adjudication; rather, *Morales* holds that a defendant is entitled to eight peremptories when a life sentence *may* be imposed for the charged offense, even if a shorter sentence is also available.[33] *Morales* does not alter or conflict with the *Schneider* decision. Accordingly, we conclude that the district court did not err when it declined to allow Nelson eight peremptory challenges.

*The unreliable identification of Nelson as the gunman was irrelevant*

Nelson also argues that Paquette's and Chugg's identifications of him as the gunman were unreliable because they were intoxicated the night of the incident and they were able to discuss their identifications while waiting in a police car together. The State agrees but contends that the identifications are irrelevant because the State argued that Nelson was the driver, not the gunman. Nelson takes issue with the State's description of its theory and points out that jury instruction number 3, which quoted the information filed by the State, stated that Nelson "and/or" Neifeld approached Paquette and displayed a firearm. Additionally, Nelson claims that since the State admits that the identifications were unreliable, this court must reverse his convictions. We disagree.

A constitutional error may be considered harmless where it may be determined beyond a reasonable doubt that the verdict was " 'surely unattributable to the error.' "[34] In this case, the State argued during closing arguments that Nelson was the driver of the vehicle. The State offered Nelson's own testimony to establish this fact along with Officer Boucher's testimony that Nelson exited the driver's side of the vehicle after the Thunderbird was stopped.

It is clear that the State's case, as presented to the jury, only alleged that Nelson was the driver, not the gunman. Thus, we con-

---

[33]116 Nev. at 21, 992 P.2d at 253 (overruling *Nootenboom v. State*, 82 Nev. 329, 418 P.2d 490 (1966)).

[34]*Summers v. State*, 122 Nev. 1326, 1343, 148 P.3d 778, 789-90 (2006) (ROSE, C. J., concurring and dissenting) (quoting *Flores v. State*, 121 Nev. 706, 721, 120 P.3d 1170, 1180 (2005)).

clude that the unreliable identifications were irrelevant and that other evidence that Nelson was the driver supported his convictions.

### The district court did not abuse its discretion in rejecting Nelson's proposed jury instructions

Nelson argues that the district court erred when it declined to use his recommended jury instructions. Nelson contends that the recommended jury instructions were not duplicative and were necessary to more fully explain aiding and abetting law. Nelson asserts that if the jury had received his proposed instructions, he could not have been convicted because there was no testimony that he knew the gunman had a gun, or that he had made an agreement to aid or abet or cooperate with the gunman.

District courts enjoy broad discretion to settle jury instructions, and we will not overturn a district court's decision concerning a particular instruction absent an abuse of discretion or judicial error.[35] Nelson offered the following proposed jury instructions:[36]

> [Proposed Instruction 2] In order for a person to be held accountable for the crime of another under an aiding and abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the crime charged.
>
> [Proposed Instruction 3] Unarmed defendant, charged as an aider or abettor or co-conspirator, cannot be held criminally responsible for use of a deadly weapon unless he has actual or constructive control over the deadly weapon. An unarmed defendant does not have constructive control over a weapon unless the State proves he had knowledge the armed offender was armed and he had the ability to exercise control over the firearm.

Instruction number 8, which was submitted to the jury, states, in pertinent part, that

> A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, or by act and advice, the commission of such crime with the intention that the crime be committed.

---

[35]*Insurance Co. of the West v. Gibson Tile*, 122 Nev. 455, 463, 134 P.3d 698, 702-03 (2006); *Ringle v. Bruton*, 120 Nev. 82, 90, 86 P.3d 1032, 1037 (2004).

[36]Nelson's first offered instruction concerned conspiracy. However that instruction duplicated jury instructions 5, 6, and 7 submitted to the jury by the court.

The State is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

In *Sharma v. State*, this court held that "in order for a person to be held accountable for the specific intent crime of another under an aiding or abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime."[37] However, in *Bolden v. State*, this court held that to convict a defendant of a general intent crime under the theory of vicarious coconspirator liability, the State is only required to prove that the crime in question was a " 'reasonably foreseeable consequence' " of the object of the conspiracy.[38]

Additionally, this court held in *Jones v. State* that " '[c]onstructive or joint possession may occur only where the unarmed participant has knowledge of the other offender's being armed, and where the unarmed offender has . . . the ability to exercise control over the firearm.' "[39] This court also recognized that if an " 'unarmed assailant has knowledge of the use of the gun and by his actual presence participates in the robbery, the unarmed offender benefits from the use of the other robber's weapon, adopting derivatively its lethal potential.' "[40]

We conclude that proposed jury instructions 2 and 3 are duplicative because they reiterate the principles of aider and abettor liability also discussed in jury instruction number 8. Additionally, proposed jury instruction number 3 is not the law in Nevada. While Nelson contends that proposed jury instruction number 3 states the law concerning an unarmed defendant charged with aiding and abetting an armed defendant, the instruction fails to recognize that an unarmed defendant with knowledge of the firearm who benefits from its use may be held liable for aiding and abetting the armed defendant.[41] Under Nevada law, an unarmed defen-

---

[37]118 Nev. 648, 655, 56 P.3d 868, 872 (2002). We note that the robbery charged in count 2 is a general intent crime, *see Hickson v. State*, 98 Nev. 78, 79, 640 P.2d 921, 922 (1982), while the conspiracy to commit robbery charged in count 1 is a specific intent crime. *See generally Garner v. State*, 116 Nev. 770, 786, 6 P.3d 1013, 1023 (2000), *overruled on other grounds by Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002).

[38]121 Nev. 908, 923, 124 P.3d 191, 201 (2005).

[39]111 Nev. 848, 852, 899 P.2d 544, 546 (1995) (alteration in original) (quoting *Anderson v. State*, 95 Nev. 625, 630, 600 P.2d 241, 244 (1979)).

[40]*Id.*

[41]*See id.*

dant who benefits from the firearm even though he does not have the ability to exercise control over the firearm may be held criminally responsible for the actions of the armed defendant. Because Nelson's proposed jury instructions are duplicative and misstate Nevada law, we determine that the district court did not err when it declined to use Nelson's proposed jury instructions.

*Nelson's habitual criminal sentence was authorized by statute*

The judgment of conviction states that Nelson was adjudicated under the "Large Habitual Criminal Statute." While Nelson contends that he was improperly adjudicated with respect to count 2, robbery with the use of a deadly weapon, under NRS 207.010(1)(b),[42] the State contends that Nelson was adjudicated under NRS 207.012(1).[43] The statutes are similar but contain a sig-

---

[42]NRS 207.010(1) states, in pertinent part,

Unless the person is prosecuted pursuant to NRS 207.012 or 207.014, a person convicted in this State of:

(a) Any crime of which fraud or intent to defraud is an element, or of petit larceny, or of any felony, *who has previously been two times convicted*, whether in this State or elsewhere, of any crime which under the laws of the situs of the crime or of this State would amount to a felony, or who has previously been three times convicted, whether in this State or elsewhere, of petit larceny, or of any misdemeanor or gross misdemeanor of which fraud or intent to defraud is an element, is a habitual criminal and shall be punished for a category B felony by imprisonment in the state prison for a minimum term of not less than 5 years and a maximum term of not more than 20 years.

(b) Any felony, *who has previously been three times convicted*, whether in this State or elsewhere, of any crime which under the laws of the situs of the crime or of this State would amount to a felony, or who has previously been five times convicted, whether in this State or elsewhere, of petit larceny, or of any misdemeanor or gross misdemeanor of which fraud or the intent to defraud is an element, is a habitual criminal and shall be punished for a category A felony by imprisonment in the state prison:

(1) For life without the possibility of parole;

(2) *For life with the possibility of parole, with eligibility for parole beginning when a minimum of 10 years has been served*; or

(3) For a definite term of 25 years, with eligibility for parole beginning when a minimum of 10 years has been served.

(Emphases added.)

[43]NRS 207.012(1) states, in pertinent part,

A person who:

(a) Has been convicted in this State of a felony listed in subsection 2; and

(b) *Before the commission of that felony, was twice convicted of any crime which under the laws of the situs of the crime or of this State would be a felony listed in subsection 2*, whether the prior convictions occurred in this State or elsewhere,

is a habitual felon and shall be punished for a category A felony by imprisonment in the state prison:

nificant difference. To be adjudicated a habitual criminal under NRS 207.010(1)(b), the State must prove that the defendant has been convicted of three prior felonies. In contrast, NRS 207.012 indicates that the district court shall sentence a defendant convicted of certain offenses as a habitual felon if two qualifying prior convictions are found.

In this case, the State filed an amended information on the first day of trial to provide notice of its intent to seek enhanced adjudication for count 2 under NRS 207.012 and for counts 1 and 3 under NRS 207.010. The amended information stated that Nelson had been previously convicted twice for robbery, and the State presented evidence of the two prior convictions. The first robbery conviction occurred on June 18, 2001, and the second robbery conviction occurred on June 21, 2001.[44] The district court stated that it was sentencing Nelson under the ''Large Habitual Criminal Statute.'' While that statement lacks clarity, the sentences imposed are consistent with NRS 207.012 for count 2 and NRS 207.010(1)(a) for counts 1 and 3, as the State had noticed the habitual criminal allegations in the amended information. Accordingly, we conclude that the district court sentenced Nelson within the scope of the applicable statutes.

## CONCLUSION

We conclude that NRS 484.348(3)(b) is not unconstitutionally vague. Nelson's remaining arguments on appeal similarly lack merit, and we therefore affirm the district court's judgment of con-

---

(1) For life without the possibility of parole;
(2) *For life with the possibility of parole, with eligibility for parole beginning when a minimum of 10 years has been served*; or
(3) For a definite term of 25 years, with eligibility for parole beginning when a minimum of 10 years has been served.

(Emphases added.)

[44]Nelson also argues that these robbery convictions do not constitute two separate felonies for the purposes of habitual criminal adjudication because they were entered three days apart and may involve negotiations that took into consideration both cases. In response, the State asserts that the crimes were entirely separate and involved separate victims. However, the record is devoid of evidence to support the assertions from either party. Accordingly, we determine that because the convictions were entered on different days and there is no evidence to establish that they were part of the same act, transaction, or occurrence, the convictions represent separate felonies for the purposes of habitual criminal adjudication. *See Halbower v. State*, 96 Nev. 210, 211-12, 606 P.2d 536, 537 (1980) (''[W]here two or more convictions result from the same act, transaction or occurrence, and are prosecuted in the same indictment or information, those several convictions may be utilized only as a single prior conviction for purposes of the habitual criminal statute.'').

viction. However, we remand to the district court to correct the language in the judgment of conviction as required by NRS 176.105 so as to properly identify the habitual criminal provisions that were applied to each count.

MAUPIN, C. J., GIBBONS, PARRAGUIRRE, DOUGLAS, CHERRY and SAITTA, JJ., concur.