EUGENE HOLLIS NUNNERY, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 51870

October 27, 2011                                                263 P.3d 235

---

[Rehearing denied December 20, 2011]

*David M. Schieck*, Special Public Defender, and *JoNell Thomas* and *Ivette A. Maningo*, Deputy Special Public Defenders, Clark County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, and *David L. Stanton* and *Nancy A. Becker*, Deputy District Attorneys, Clark County, for Respondent.

*Catherine Cortez Masto*, Attorney General, and *Robert E. Wieland*, Senior Deputy Attorney General, Carson City, for Amicus Curiae Office of the Attorney General.

*Richard A. Gammick*, District Attorney, and *Terrence P. McCarthy*, Deputy District Attorney, Washoe County, for Amicus Curiae Washoe County District Attorney.

*Jeremy T. Bosler*, Public Defender, and *John Reese Petty*, Chief Deputy Public Defender, Washoe County, for Amicus Curiae Washoe County Public Defender.

*Franny A. Forsman*, Federal Public Defender, and *Michael Pescetta*, Assistant Federal Public Defender, Las Vegas, for Amicus Curiae Office of the Federal Public Defender for the District of Nevada.

*Paola M. Armeni*, Las Vegas, for Amicus Curiae Nevada Attorneys for Criminal Justice.

Before the Court EN BANC.

## OPINION

By the Court, CHERRY, J.:

A jury found appellant Eugene Nunnery guilty of multiple charges and sentenced him to death for a first-degree murder conviction. Nunnery raises numerous claims of error at the guilt and penalty phases of his trial and challenges his death sentence. We conclude that none of his claims warrant relief and therefore affirm the judgment of conviction.

In this opinion, we focus primarily on three of Nunnery's claims related to the penalty phase of the trial. First, we consider the circumstances in which a district court may allow an untimely notice of evidence in aggravation under SCR 250(4)(f). We hold that the district court has discretion to allow an untimely notice of evidence in aggravation upon a showing of good cause and that the relevant factors include the danger of prejudice to the defense in its preparation as a result of the untimely notice. Second, we consider whether the confidentiality provision in NRS 176.156 precludes the admission of presentence investigation reports at penalty hearings. We conclude that it does not and that the admission of information in presentence investigation reports is within the discretion of the trial judge. Third, we consider whether Nunnery's Sixth Amendment trial rights were violated when the district court declined to instruct the jury that it must find beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances before it could find him eligible for the death penalty. We conclude that the district court did not err because the weighing of the aggravating and mitigating circumstances is not a factual determination subject to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), and because Nevada's statutory scheme focuses on whether there are mitigating circumstances sufficient to outweigh the aggravating

circumstances, not whether the aggravating circumstances outweigh the mitigating circumstances.

## FACTS AND PROCEDURAL HISTORY

On the night of September 22, 2006, a group of five men were in the parking lot of a Las Vegas apartment complex conversing and listening to music when Nunnery and three other men[1] approached them and demanded money. All four assailants were armed with guns. Three of the victims took out their wallets and placed them on the ground, but 19-year-old Victor Ambriz-Nunez was unable to get his wallet out of his pocket and decided to run, prompting Nunnery and his companions to begin firing their weapons. Nunnery grabbed Ambriz-Nunez's uncle, Saul Nunez, and shot him in the head at close range, killing him. He also fired at the fleeing Cesar Leon, hitting him in the back of the head. At the same time, Nunnery's companions were shooting at the other fleeing victims. Leon survived, as did the remaining three victims: Ambriz-Nunez was able to escape without being hit and Leo Carlos and Leobardo Ledesma both survived by falling to the ground and pretending that they were dead. Before fleeing, Nunnery shot Nunez twice more to ensure that he was dead.

A cell phone dropped at the crime scene led the police to one of Nunnery's companions. During the subsequent search of an apartment where Nunnery resided, investigators recovered a gun that was forensically matched to shells recovered from the crime scene and the bullet recovered from Nunez's head. Nunnery confessed to the crime during an interview with police. In particular, he admitted to planning the robbery and choosing the victims, as well as to killing Saul Nunez and shooting Leon.

Nunnery was charged with open murder for the shooting of Saul Nunez based on three theories: (1) premeditation and deliberation, (2) felony murder, and (3) aiding and abetting. In addition, he was charged with attempted murder for the shooting of Cesar Leon, attempted murder for shooting at the fleeing Victor Ambriz-Nunez or Leobardo Ledesma, conspiracy to commit robbery, robbery, and two counts of attempted robbery. The State elected to seek the death penalty, and Nunnery was tried separately from his codefendants.

At the guilt phase of trial, the State presented the testimony of the surviving victims, other eyewitnesses to the crime, investigating officers, and the pathologist who performed the autopsy and concluded by presenting Nunnery's confession. The defense did not present any evidence. After deliberating for two hours, the jury

---

[1]Nunnery's companions were George Brass, Brandon Bland, and Carlton Fowler.

returned a verdict of guilty on all counts.[2] The case then proceeded to a jury trial on the penalty for the murder conviction.

The district court bifurcated the penalty hearing into two phases. In the first phase, the jury heard evidence of the aggravating and mitigating circumstances and weighed those circumstances; in the second phase, the jury considered other evidence relevant to sentencing and determined the sentence for the murder conviction.

During the first phase of the penalty hearing, the State alleged six aggravating circumstances based on the guilt-phase evidence: Nunnery had been convicted of four violent felonies based on (1) the attempted murder of Cesar Leon, (2) the attempted murder of Victor Ambriz-Nunez or Leobardo Ledesma, (3) the armed robbery of Cesar Leon, and (4) the attempted robbery of Leobardo Ledesma, NRS 200.033(2)(b); (5) he ''knowingly created a great risk of death to more than one person,'' NRS 200.033(3); and (6) the murder was committed while he was engaged in a robbery, NRS 200.033(4). In support of these aggravating circumstances, the State moved to introduce all of the evidence that had been presented at the guilt phase and did not present any additional evidence.

As mitigating evidence, Nunnery presented testimony concerning his childhood and mental health history. The defense called 14 witnesses, including members of Nunnery's extended family, former teachers, ex-girlfriends, investigators for the defense, and two expert witnesses. Nunnery's family members testified that his father had been a drug addict and his mother had been an alcoholic, his mother died of an overdose when he was young, and he and his siblings were taken from his father and placed in foster care. In foster care, the children were separated; Nunnery was moved frequently due to his behavior and therefore lacked a stable living situation. Turning to his mental health, Nunnery presented testimony regarding his intellectual functioning and the possibility that he suffered from fetal alcohol syndrome, which refers to the mental, physical, and growth problems that a child may experience when a mother consumes alcohol during pregnancy.[3] His former teachers testified that Nunnery had some minor learning disabilities, while two expert witnesses suggested that Nunnery exhibited effects that were consistent with a mild form of fetal alcohol syn-

---

[2]The verdict form indicates that the jury unanimously found that the murder was willful, deliberate, and premeditated.

[3]Fetal alcohol syndrome has been defined as the ''well-known result of alcohol abuse during pregnancy,'' which consists of ''fetal growth retardation, central nervous system abnormalities including mild-to-moderate mental retardation, congenital heart defects, and various craniofacial abnormalities.'' 5 Roscoe N. Gray, M.D., & Louise J. Gordy, M.D., LL.B., *Attorneys' Textbook of Medicine* § 17.34(1) (3d ed. 2010).

drome. According to Dr. William Orrison, a neuroradiologist, an MRI showed that Nunnery had a below-average number of connections in his corpus callosum, which was consistent with fetal alcohol effect.[4] Dr. Thomas Kinsora, a clinical neuropsychologist, concurred with that opinion and further opined that Nunnery has problems with impulse control and has a cognitive disorder, but he admitted that the evidence did not show "full blown" fetal alcohol syndrome.

The jury unanimously found that the State had proven all six aggravating circumstances beyond a reasonable doubt. One or more jurors found eleven mitigating circumstances: (1) Nunnery's parents were drug addicts, (2) he was born and raised in poverty, (3) his mother died at an early age, (4) he was exposed to drug abuse and crime at an early age, (5) his father abandoned the children, (6) he was raised without adequate parental figures, (7) he had no extended family support, (8) he was separated from his siblings by the system, (9) he suffered from Low Impulse Control, (10) he suffered from Attention Deficit Disorder, and (11) he was a special education student. The jury concluded that the mitigating circumstances were not sufficient to outweigh the aggravating circumstances.

During the second phase of the penalty hearing, the State presented evidence related to Nunnery's criminal history and a victim-impact statement from Nunez's brother. The criminal-history evidence included a prior conviction for trafficking in a controlled substance and pending charges that included two other murders. One of the pending cases involved a murder and robbery that occurred approximately 10 days before the incident in this case under similar circumstances; the other pending case involved the murder of a drug dealer and shooting of a 15-year-old girl that had occurred the preceding month. Nunnery had confessed to his involvement in those incidents and was facing trial in both cases at the time of the penalty hearing. The jury also heard testimony that Nunnery had confessed to involvement in two unsolved armed robberies.

Nunnery's presentation during the second phase focused on sociological and penological evidence. Dr. Martin Sanchez-Jankowski, a sociologist, testified regarding the relationship between poverty and violence and the impact of growing up in a poor neighborhood such as the one in which Nunnery was raised. A retired California corrections employee described the conditions at

---

[4]Fetal alcohol effect has been defined as "[a] milder form of the fetal alcohol syndrome . . . , caused by an intake of moderate or even small amounts of alcohol by a pregnant woman" and includes effects such as "emotional problems, inability to cope in school or on the job, difficulty in paying attention, insomnia, etc." 2 J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine and Word Finder* F-64 (2010).

Ely State Prison and the structured and secured environment in which Nunnery would live if he received a life sentence. One of Nunnery's ex-girlfriends and his sister each briefly testified about the positive impact he could have if he was sentenced to life in prison. Finally, when given the opportunity to make a statement in allocution, Nunnery admitted his guilt and expressed no remorse, telling the jury:

> I'm not sorry for what I did. I'm guilty. I'd do it again. I'm not sorry. I did that. Whether I get the death penalty or life, hey, that's what happened. [The prosecutor] dropped all the charges, I walk out of here right now, and I'd do the same thing.

After deliberating for two hours, the jury sentenced Nunnery to death for the first-degree murder conviction. In a separate sentencing hearing, the district court sentenced Nunnery to various prison terms for the remaining convictions.

## DISCUSSION

The primary issues addressed in this opinion involve the penalty phase of the trial—the admission of evidence in aggravation that was summarized in an untimely notice, the testimony regarding the presentence investigation report, and the instruction on weighing of aggravating and mitigating circumstances. We therefore address the penalty-phase issues first. We then turn to the guilt-phase issues and, finally, conclude with our mandatory review of the death sentence under NRS 177.055(2).

### Penalty-phase claims

#### Notice of evidence in aggravation under SCR 250(4)(f)

In a case in which the death penalty is sought, the State is required by SCR 250(4)(f) to file a notice of evidence in aggravation "no later than 15 days before trial is to commence." The notice must "summarize the evidence which the state intends to introduce at the penalty phase of trial . . . and identify the witnesses, documents, or other means by which the evidence will be introduced." SCR 250(4)(f). Evidence that is not summarized in the notice "shall not" be admitted "[a]bsent a showing of good cause." *Id.* "If the court determines that good cause has been shown to admit evidence not previously summarized in the notice, it must permit the defense to have a reasonable continuance to prepare to meet the evidence." *Id.*

Here, the State filed its notice of evidence in aggravation on March 12, 2008—12 days before the trial commenced on March 24, 2008. Nunnery moved to preclude the State from presenting any evidence in aggravation at the penalty phase based on

its failure to file the notice in a timely fashion. The district court denied the motion, finding "good cause to find excusable neglect" based on the sequence in which the three murder cases were supposed to be tried and no prejudice to the defense because similar notices had been filed months earlier in the two other murder cases and all three cases involved the same attorneys. Nunnery takes issue with the district court's focus on lack of prejudice to the defense, arguing that lack of prejudice is not a relevant consideration, and argues that the State failed to show good cause to justify its untimely notice. Alternatively, he argues that he was prejudiced by admission of the evidence summarized in the untimely notice, particularly the evidence related to the two other pending murder cases, because, according to Nunnery, without that evidence, "there is a reasonable probability that the jury would not have returned a sentence of death."

We have addressed SCR 250(4)(f) in only one published decision. In *Mason v. State*, we held that the rule applies to "other matter" evidence that is admissible at a capital penalty hearing, not just evidence related to statutory aggravating circumstances. 118 Nev. 554, 560-62, 51 P.3d 521, 525-26 (2002). We therefore concluded that the district court erred in admitting evidence that had not been included in the notice of evidence in aggravation "without determining whether there was good cause for not providing notice of it earlier." *Id.* at 562, 51 P.3d at 526. But we further determined that the error was harmless because the defendant was not sentenced to death and the evidence was otherwise admissible. *Id.* As a result, *Mason* did not address the meaning of good cause for purposes of SCR 250(4)(f).

In that void, Nunnery turns to our decisions interpreting the good-cause requirement in another notice provision in SCR 250(4)—the provision that requires the State to file a notice of intent to seek the death penalty within 30 days after the indictment or information is filed, SCR 250(4)(c). *See, e.g., State v. Dist. Ct. (Marshall)*, 116 Nev. 953, 11 P.3d 1209 (2000). Under that provision, the district court has discretion to "grant a motion to file a late . . . or . . . amended notice" of intent but only "[u]pon a showing of good cause." SCR 250(4)(d). In interpreting those provisions, we have indicated that " '[g]ood cause requires a reason *external* to the prosecutor for [the] failure to serve notice,' " *Marshall*, 116 Nev. at 968, 11 P.3d at 1218 (quoting *State v. Dearbone*, 883 P.2d 303, 305 (Wash. 1994)), and that "nothing in the [notice of intent] rule suggests that lack of prejudice to the defendant can supplant the express requirement of a showing of good cause before the district court may grant a motion to file a late notice of intent to seek death," *id.* at 967, 11 P.3d 1209 at 1217. Given this interpretation of the notice of intent provisions, we held in *Marshall* that the district court had not manifestly abused

its discretion or acted arbitrarily or capriciously in not allowing the State's late notices of intent after finding no good cause based on the prosecutor's workload and oversight in failing to timely file the notice or the complexity of the case. *Id.* at 966-67, 11 P.3d at 1217.

We agree with Nunnery that there are some similarities between the notice provisions in SCR 250(4)(c)-(d) and those in SCR 250(4)(f). In particular, both notice provisions use the phrase "good cause" and both provide for a continuance for the defense to meet the allegations or evidence when there has been a finding of good cause. But the provisions differ in at least one relevant respect. SCR 250(4)(d) specifically addresses a late or amended notice of intent, allowing the district court to grant a motion to file a late or amended notice of intent upon a showing of good cause. In contrast, SCR 250(4)(f) does not specifically address a late or amended notice of evidence in aggravation; instead, it allows the district court to admit "evidence *not summarized* in the notice" only upon a showing of good cause. (Emphasis added.) If we interpret this omission to preclude a late or amended notice of evidence in aggravation while allowing the court to admit evidence that is not included, it would lead to an absurd result: the rule would discourage the State from filing a late or amended notice at all. We cannot countenance such a result, *see State v. Kopp*, 118 Nev. 199, 204, 43 P.3d 240, 343 (2002) (observing general rule that statute should be interpreted to avoid absurd results); *see also* SCR 249(1) ("The rules set forth in this part shall be liberally construed to secure the proper and efficient administration of the business and affairs of the court in the cases to which these rules apply and to promote and facilitate the administration of justice by the court."), and neither party in this case appears to argue for such an interpretation. Because the rule allows the district court to admit evidence that is not summarized in a notice of evidence in aggravation upon a showing of good cause, we conclude that the rule similarly allows a late or amended notice of evidence in aggravation upon a showing of good cause. This interpretation avoids an absurd result while adhering to the policy and spirit of SCR 250(4)(f), *see* SCR 250(1) ("The purposes of this rule are: to ensure that capital defendants receive fair and impartial trials . . . ; to minimize the occurrence of error in capital cases . . . ; and to facilitate the just and expeditious final disposition of all capital cases."), which is intended to ensure that a defendant has advance notice of the evidence in aggravation that he must be prepared to meet, *see People v. Taylor*, 34 P.3d 937, 953 (Cal. 2001) ("The purpose of the notice provision is to afford defendant an opportunity to meet the prosecutor's aggravating evidence.").

The policy and spirit behind SCR 250(4)(f) must also guide us in giving meaning to the phrase ''good cause'' as used in that provision. '' '[G]ood cause' is a relative and highly abstract term'' such that ''its meaning must be determined not only by the verbal context of the statute in which the term is employed, but also by the context of the action and procedures involved and the type of case presented.'' *Wray v. Folsom*, 166 F. Supp. 390, 394 (W.D. Ark. 1958); *see also Bailey v. Parish of Caddo*, 716 So. 2d 523, 530 (La. Ct. App. 1998) (observing that good cause ''is frequently invoked and seldom defined'' and that ''its meaning is fixed by the verbal context as well as the 'actions and procedures involved' '' (quoting *Wray*, 166 F. Supp. at 394)). Although the two notice provisions in SCR 250(4) require showings of good cause to justify a late or amended notice, we are not convinced that they necessitate the same standard of good cause given the different purposes that the notices serve.

The notice of intent required under SCR 250(4)(c)-(d) puts the defendant on notice that the State will seek the death penalty, which carries with it the requirement that the State prove at least one statutory aggravating circumstance, *see* NRS 175.554(1), (3); NRS 200.030(4)(a), and triggers a panoply of rights, *see, e.g.*, *Ring v. Arizona*, 536 U.S. 584 (2002), and procedures, *see* SCR 250, that otherwise would not apply. And as we explained in *Bennett v. District Court*, ''[t]he purpose of SCR 250(4)(d) is to protect a capital defendant's due process rights to fair and adequate notice of aggravating circumstances, safeguard against any abuse of the system, and insert some predictability and timeliness into the process.'' 121 Nev. 802, 810, 121 P.3d 605, 610 (2005). Recognizing the importance of that notice, SCR 250(4)(d) provides a bright-line rule that in no event can an initial notice of intent be filed later than 30 days before trial. Based in part on that provision, we declined in *Marshall* to allow a good-cause showing under SCR 250(4)(d) to be based on lack of prejudice. *See* 116 Nev. at 967, 11 P.3d at 1217. The bright-line rule and restriction on lack of prejudice to establish good cause serve the purposes of this notice by ''requir[ing] accountability and diligence by the State when deciding what aggravators to pursue in the first instance.'' *Bennett*, 121 Nev. at 810, 121 P.3d at 610.

In contrast, the notice of evidence in aggravation lets the defendant know what evidence he must be prepared to meet at the penalty hearing, similar to the more general disclosure of witnesses and experts that are required in criminal cases under statutes such as NRS 174.234, and the district court may admit evidence that is not summarized in the notice upon a showing of good cause. SCR 250(4)(f). These provisions reflect a less stringent approach to the notice of evidence in aggravation. For example, unlike SCR 250(4)(d), these provisions do not draw an express bright-line

after which a notice cannot be filed or unnoticed evidence cannot be admitted; instead, they allow for the admission of unnoticed evidence upon a showing of good cause.

In the context of SCR 250(4)(f) and given the purpose of the notice of evidence in aggravation, we conclude that a broader range of factors may be considered in determining good cause under SCR 250(4)(f), including lack of prejudice to the defense. Our prior decisions addressing good cause in the context of pretrial notice statutes that serve purposes similar to SCR 250(4)(f) provide some guidance. For example, in *Founts v. State*, this court identified a variety of factors to be considered in assessing good cause for an untimely notice of alibi witnesses under former NRS 174.087, including ''whether an excuse was shown for the omission,'' ''reasons why the proper notice was not given,'' ''surprise and its consequent prejudicial effect upon [the other party's] investigation and cross-examination of witnesses,'' and ''the prejudicial effect upon either side by the admission or nonadmission of the testimony and the feasibility of a postponement.'' 87 Nev. 165, 169-70, 483 P.2d 654, 656 (1971); *cf. Raymond v. Ameritech Corp.*, 442 F.3d 600, 606-07 (7th Cir. 2007) (applying factors adopted by Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993), for finding excusable neglect[5] to Federal Rule of Civil Procedure 6(b)(2): (1) the danger of prejudice to the nonmoving party; (2) the length of the delay and its potential impact on the proceedings, (3) the reason for the delay, including whether it was within the moving party's control, and (4) whether the moving party acted in good faith). We conclude that the following factors are consistent with the purpose of the notice required by SCR 250(4)(f)—they ensure that the defendant has sufficient notice to prepare to meet the evidence while taking into consideration the reasons for the delay—and therefore must be considered in determining whether there is good cause for filing a late notice under SCR 250(4)(f): (1) the reason for the delay, including whether it was within the State's control, (2) whether the State acted in good faith, (3) the length of the delay, and (4) the danger of prejudice to the defendant. Although the absence of prejudice is a relevant factor, we emphasize that the absence of prejudice alone is never sufficient to constitute good cause to excuse the late filing of a notice under SCR 250(4)(f). *Cf. MCI Telecommunications*, 71 F.3d at 1097 (discussing good cause

---

[5]Some federal courts ''have equated 'good cause' with the concept of 'excusable neglect' of [Rule 6(b)(2)].'' *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097 (3d Cir. 1995) (discussing good cause for failure to timely serve complaint and summons under Federal Rule of Civil Procedure 4).

under Federal Rule of Civil Procedure 4). The factors we identify today are nonexhaustive and a good-cause determination ultimately must take account of all relevant circumstances surrounding the State's untimely filing. *See Founts*, 87 Nev. at 169, 483 P.2d at 656 (" 'Good cause' for the exercise of such discretion may be shown by a variety of factors and the particular situation presented by each case must be considered.").

We have indicated that a finding of good cause is within the district court's discretion. *See generally Marshall*, 116 Nev. at 965-68, 11 P.3d at 1216-18; *see also Butler v. State*, 120 Nev. 879, 892, 102 P.3d 71, 80 (2004) (applying abuse-of-discretion standard to district court's finding of good cause to excuse prosecution's failure to comply with notice requirements under NRS 174.233); *accord Wilson v. Morris*, 369 S.W.2d 402, 407 (Mo. 1963) (" 'Good cause' depends upon the circumstances of the individual case, and a finding of its existence lies largely in the discretion of the officer or court to which the decision is committed."). The question thus is not whether members of this court or other jurists would have found good cause, but whether the district court abused its discretion. *Cf. Marshall*, 116 Nev. at 966, 11 P.3d at 1216-17 (observing that State offered colorable argument that "district court might have been within its discretion if it had allowed the late filings" of notices of intent but that did not establish "that the district court manifestly abused its discretion or acted arbitrarily or capriciously in *not* allowing the late filings, as is required for this court to grant extraordinary relief"). "An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001).

With this framework in mind, we turn to the circumstances presented in this case, focusing first on the reasons for the delay, whether the State acted in good faith, and the length of the delay. The prosecution's reason for the delay was that it was waiting for the trials in the other two cases before deciding what evidence it would use at the penalty phase in this case because with this case proceeding to trial last, it would not be clear what evidence would be admissible or necessary in the penalty phase of this trial until the other trials were complete.[6] Originally, this case was scheduled to be the last of the three cases to go to trial. The first case filed

---

[6]In this, we note for example that the notice of intent included aggravating circumstances based on convictions in the other cases. The State's ability to proceed on those aggravating circumstances and the evidence that would be presented to establish them depended on convictions in those cases.

was scheduled to go to trial in November 2007, the second case filed was scheduled to go to trial in February 2008, and this case was scheduled to go to trial in March 2008. The November trial date for the first case was vacated in November 2007 and the following month was scheduled to go to trial in July 2008. The February 2008 trial date for the second case was vacated in February because this court had granted a motion for a stay. The trial date for that case was not reset until after the trial in this case. Thus, by February 19, 2008, more than 15 days before the trial date in this case, the trial order had changed so that this case was scheduled to go to trial first. However, at the same time, there was a pending motion in this case to strike 13 of the aggravating circumstances from the notice of intent. That motion raised issues similar to those raised in the other two cases, which resulted in original writ proceedings in this court that were still pending in February and March and had caused the delays in the trials of those cases. The district court orally ruled on the motion in this case on February 27, 2008, and filed its written order on March 4, 2008, denying the motion in part and refusing to stay the trial in this case. The scheduling issues understandably created some problems given the unique complexities of the multiple capital prosecutions of Nunnery, including the overlapping challenges to the aggravating circumstances that had delayed the other cases, and were not entirely within the State's control. Although the prosecution arguably knew by February 19, 2008, at the earliest, and March 4, 2008, at the latest, that this case would be the first to be tried, the delay thereafter in filing the notice of evidence in aggravation was not significant, and there is nothing in the record to suggest that the State acted in bad faith. Ultimately, the notice was filed just three days late, and the late filing does not appear to have had an impact on the proceedings as the parties and the court had sufficient opportunity to address any objections to the admissibility of the evidence.

Finally, as the district court found, there was no prejudice to the defense as a result of the late filing. Contrary to Nunnery's suggestion, prejudice in this context is not the impact that the evidence summarized in the untimely notice had on the jury's penalty verdict, but the impact that the untimely notice had on Nunnery's ability to prepare to meet the evidence in aggravation, which is the primary purpose that the notice serves. *See Butler*, 120 Nev. at 892, 102 P.3d at 80 (addressing good cause for prosecution's failure to comply with requirements for notice of evidence in rebuttal to alibi evidence, NRS 174.233(2), (4), and noting that defendant "failed to specify how he could have impeached [rebuttal witness's] testimony even if given timely notice . . . and has therefore

shown no prejudice''). Similar notices of evidence in aggravation had been filed in the other two cases and the same attorneys represented Nunnery in all three cases. Defense counsel did not seek a continuance to prepare to meet that evidence.

Considering all of the relevant factors, we are not convinced that the district court abused its discretion. Although the district court likely would have been within its discretion if it had denied the late filing, under the totality of the circumstances presented, we cannot conclude that the district court's decision to allow the late filing was arbitrary or capricious or exceeded the bounds of law or reason. Therefore there was no abuse of discretion.

### Presentence investigation reports

Relying on NRS 176.156(5) and *Herman v. State*, 122 Nev. 199, 128 P.3d 469 (2006), Nunnery argues that the district court erred by allowing the State to present unfavorable evidence, including prior convictions and his social history, from a presentence investigation report (PSI) that had been prepared in another case. In *Herman*, a panel of this court concluded that reading a list of the defendant's prior uncharged arrests from a PSI report during the penalty phase of a noncapital murder trial constituted plain error and warranted a new penalty hearing. *Id.* at 208-09, 128 P.3d at 474-75. The panel concluded that reading portions of the PSI amounted to plain error because (1) it was ''tantamount to entering [the PSI] into and making it part of the public record'' in violation of NRS 176.156(5), *id.* at 208, 128 P.3d at 474; and (2) while Herman's arrests for violent crimes were ''relevant to the crime charged,'' information regarding other arrests was prejudicial and had ''no bearing on Herman as a violent individual capable of murder.'' *Id.* at 209, 128 P.3d at 475. Subsequently, capital defendants have raised claims, based on *Herman* and NRS 176.156(5), that PSI evidence is inadmissible at capital penalty hearings. There are two flaws in *Herman* that undermine such claims.

First, *Herman* mistakenly suggests that NRS 176.156(5) precludes the admission of PSI evidence. Prior to *Herman*, in *Guy v. State*, 108 Nev. 770, 782, 839 P.2d 578, 586 (1992), this court rejected as ''untenable'' an argument that NRS 176.156 rendered a PSI report prepared in one of the defendant's prior cases inadmissible at his capital penalty hearing. We reaffirm that holding. NRS 175.552 grants broad discretion to the trial courts with regard to the admission of evidence at penalty hearings in first-degree murder cases. And NRS 176.156(2) explicitly permits the use of PSI reports by law enforcement agencies or other political subdivisions

of the State "for the limited purpose of performing their duties, including, *without limitation*, conducting hearings that are public in nature." (Emphasis added.) The rule that PSI reports are not to be made a part of the public record does not preclude disclosures that are allowed by NRS 176.156(2). *See* NRS 176.156(5). Because the statute expressly permits the use of PSI reports at public hearings, we disavow any language in *Herman* that can be read to support the conclusion that NRS 176.156 renders PSI evidence inadmissible at a penalty hearing.

Second, *Herman* focused on the information about prior arrests and mistakenly suggested that the evidence was irrelevant at sentencing. The court in *Herman* observed that some of the arrests suggested a pattern of conduct that was relevant to the crime charged (murder) but that other arrests had "no bearing on Herman as a violent individual capable of murder." *Herman*, 122 Nev. at 209, 128 P.3d at 475. That decision fails to take sufficient notice of the district court's discretion and the nature of the sentencing determination in considering whether evidence is admissible at a penalty hearing. The decision to admit evidence at a penalty hearing is left to the discretion of the trial judge.[7] *See* NRS 175.552; *Guy*, 108 Nev. at 782, 839 P.2d at 586. "NRS 175.552 establishes broad parameters as to what constitutes admissible evidence at a penalty phase." *Guy*, 108 Nev. at 782, 839 P.2d at 586. Consistent with that breadth, we have stated that evidence of uncharged crimes may be admitted at a capital penalty hearing as "other matter" evidence. *See, e.g.*, *Guy*, 108 Nev. at 782, 839 P.2d at 586; *Robins v. State*, 106 Nev. 611, 625-26, 798 P.2d 558, 567 (1990); *Crump v. State*, 102 Nev. 158, 161, 716 P.2d 1387, 1388 (1986); *Gallego v. State*, 101 Nev. 782, 791, 711 P.2d 856, 863 (1985). Such evidence is relevant because a sentencing determination should be based on the entirety of a defendant's "character, record, and the circumstances of the offense," *Browning v. State*, 124 Nev. 517, 526, 188 P.3d 60, 67 (2008), but it may be excluded from a capital penalty hearing if it is "impalpable or highly suspect." *Gallego v. State*, 117 Nev. 348, 369, 23 P.3d 227, 241 (2001) (police investigations of other crimes); *see also Leonard v. State*, 114 Nev. 1196, 1214, 969 P.2d 288, 299 (1998) (police investigation of crimes for which defendant has not been convicted); *Homick v. State*, 108 Nev. 127, 138, 825 P.2d 600, 607 (1992) (evidence of other pending homicide charges). It is of

---

[7]This discretion is not limited to capital penalty hearings; the statutes that grant broad discretion regarding the admission of evidence at a penalty hearing do not differentiate between capital and noncapital hearings. *See* NRS 175.552-.556.

no concern whether the evidence tends to show the defendant's guilt, as guilt is not the focus of a penalty hearing. *Browning*, 124 Nev. at 526, 188 P.3d at 67. To the extent any language in *Herman* suggested otherwise, we disavow it.[8]

Here, Nunnery failed to object to the introduction of unfavorable evidence from the PSI. We emphasize that a defendant must object to any evidence in a PSI that he believes is unduly prejudicial or otherwise inadmissible; otherwise, he forfeits appellate review of that matter. *See Browning*, 124 Nev. at 533, 188 P.3d at 71. When there has been no objection at trial, a defendant will be entitled to relief only if he can show plain error—that an error is " 'so unmistakable that it is apparent from a casual inspection of the record' " and that the error " 'affected his substantial rights.' " *Vega v. State*, 126 Nev. 332, 338, 236 P.3d 632, 637 (2010) (quoting *Nelson v. State*, 123 Nev. 534, 543, 170 P.3d 517, 524 (2007)). Nunnery failed to demonstrate any error, much less plain error. The individual who prepared the PSI report testified regarding her preparation of the PSI report and the information contained in it, and defense counsel was able to cross-examine her. And the PSI report entered into evidence was redacted to remove references to prior arrests that did not result in conviction. These procedures were proper, and Nunnery fails to show that the testimony and documentary evidence of his prior drug conviction and social history were inadmissible.

### Weighing instruction

Nevada law provides that in cases in which the State seeks the death penalty, the jury must weigh aggravating and mitigating circumstances. NRS 175.554(2), (3). Nunnery argues that he has a constitutional right to a jury finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and he thus takes issue with the district court's refusal to so instruct the jury.

This is not the first time that we have spoken to whether the beyond-a-reasonable-doubt standard applies to the weighing of aggravating and mitigating circumstances, but our prior decisions have created an apparent conflict. This court had long reject-

---

[8]The evidence that the panel found prejudicial in *Herman* is the same kind of evidence given to every judge before a sentencing determination. We are cognizant, however, that jurors may not be as familiar as our trial court judges with PSI reports and their potential pitfalls. As a result, trial judges must exercise care in admitting PSI evidence. The district court did so here.

ed claims that the weighing of aggravating and mitigating circumstances in a death penalty case was subject to the beyond-a-reasonable-doubt standard. *See, e.g., DePasquale v. State*, 106 Nev. 843, 852, 803 P.2d 218, 223 (1990). But the issue found some new life after the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that any fact other than a prior conviction "that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," and *Ring v. Arizona*, 536 U.S. 584, 589 (2002), that capital defendants have a Sixth Amendment right to a jury determination of aggravating circumstances that make the defendant eligible for the death penalty. Based on *Ring*, this court decided in *Johnson v. State*, 118 Nev. 787, 59 P.3d 450 (2002), that the use of a three-judge panel to find aggravating circumstances in capital cases was unconstitutional because those findings must be made by a jury based on the beyond-a-reasonable-doubt standard. In doing so, we commented on the elements of death eligibility under Nevada's death penalty scheme and, although the issue had not been raised in that case, we indicated that the weighing determination was subject to the same requirement:

> Nevada statutory law requires two distinct findings to render a defendant death-eligible: The jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance *and further finds* that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found. This second finding regarding mitigating circumstances is necessary to authorize the death penalty in Nevada, and we conclude that it is in part a factual determination, not merely discretionary weighing. So even though *Ring* expressly abstained from ruling on any Sixth Amendment claim with respect to mitigating circumstances, we conclude that *Ring* requires a jury to make this finding as well: If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.

*Johnson*, 118 Nev. at 802-03, 59 P.3d at 460 (internal quotations omitted). When directly presented with the question more recently in *McConnell v. State* (*McConnell III*), 125 Nev. 243, 254, 212 P.3d 307, 314-15 (2009), we reached a contrary conclusion, stating that "[n]othing in the plain language of [the relevant statutory] provisions requires a jury to find, or the State to prove, beyond a reasonable doubt that no mitigating circumstances outweighed the

aggravating circumstances in order to impose the death penalty." And we further observed that this court "has imposed no such requirement." *Id*. The holding in *McConnell III* thus conflicts with the dicta in *Johnson*. We take this opportunity to resolve this conflict and hold that even if the result of the weighing determination increases the maximum sentence for first-degree murder beyond the prescribed statutory maximum, it is not a factual finding that is susceptible to the beyond-a-reasonable-doubt standard of proof. Therefore, we reaffirm *McConnell III* and overrule *Johnson* to the extent that it suggests that the weighing of aggravating and mitigating circumstances is subject to the beyond-a-reasonable-doubt standard.

### *Weighing is not fact-finding*

At the penalty phase of a capital trial in Nevada, the jury determines whether any aggravating circumstances have been proven beyond a reasonable doubt and whether any mitigating circumstances exist. NRS 175.554(2), (4). If the jury unanimously finds that at least one statutory aggravating circumstance has been proven beyond a reasonable doubt, the jury must also determine whether there are mitigating circumstances "sufficient to outweigh the aggravating circumstance or circumstances found." NRS 175.554(3); *see also* NRS 175.554(4). As this court observed in *DePasquale*, 106 Nev. at 852, 803 P.2d at 223, and *McConnell III*, 125 Nev. at 254, 212 P.3d at 314-15, the relevant statutes do not impose a burden of proof on the weighing determination. The only mention of a burden of proof in the relevant statutes appears in NRS 175.554(4), but it clearly applies to the finding of aggravating circumstances, not to the existence of mitigating circumstances or the weighing of the two. Given the statutory silence, we turn to the premise that the Sixth Amendment, as interpreted in *Apprendi* and *Ring*, requires that a jury make the weighing determination based on proof meeting the beyond-a-reasonable-doubt standard.[9]

*Johnson* indicates that the weighing determination "is in part a factual determination," 118 Nev. at 802, 59 P.3d at 460, and therefore is subject to the same Sixth Amendment requirements that the Court applied to the finding of aggravating circumstances

---

[9]Although the Court in *Ring* held that capital defendants have a Sixth Amendment right to a jury determination that the aggravating circumstances have been proven beyond a reasonable doubt when death is not an available sentence unless at least one aggravating circumstance is found, 536 U.S. at 609, the Court expressly did not address the finding of mitigating circumstances or the weighing of aggravating and mitigating circumstances, *id*. at 597 n.4.

in *Ring*. That analysis in *Johnson* is prefaced by the statement, oft-repeated in our cases, that "Nevada statutory law requires two distinct findings to render a defendant death-eligible:" (1) a finding of at least one aggravating circumstance and (2) a finding that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found. 118 Nev. at 802, 59 P.3d at 460. We then observed that the second finding "regard[s] mitigating circumstances" and "is in part a factual determination, not merely discretionary weighing," *id.*, but we did not describe what part is factual. When the "second finding" is broken down to reflect all of the statutory requirements, the answer becomes apparent. The "second finding" described in *Johnson* combines the determination that mitigating circumstances exist, NRS 175.554(2)(b), with the determination that "there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found," NRS 175.554(3). When separated, it is apparent that the factual determination implicated in the "second finding" described by *Johnson* is the existence of mitigating circumstances. With that understanding, the conclusion that the "second finding" is "in part a factual determination," 118 Nev. at 802, 59 P.3d at 460, is correct to the extent that it refers to the finding of mitigating circumstances.[10] That does not mean, however, that the subsequent *weighing* of aggravating and mitigating circumstances involves a factual determination.

Although some state courts have characterized the weighing determination itself as fact-finding, in large part, their reasons for doing so are not clear. The Colorado Supreme Court has done so without any explanation. *Woldt v. People*, 64 P.3d 256, 265-66 (Colo. 2003). Similarly, the Missouri Supreme Court has characterized the weighing determination as fact-finding with little explanation, relying primarily on *Woldt* and our dicta in *Johnson*. *State v. Whitfield*, 107 S.W.3d 253, 258-61 (Mo. 2003). Perhaps the best explanation for this approach is articulated by the dissenting judge in a Maryland case, *Oken v. State*, 835 A.2d 1105, 1163-65 (Md. 2003) (Raker, J., dissenting). The dissenter in that case based his reasoning on three aspects of the Maryland death penalty statute: (1) the statute included a burden of proof in the weighing process and burdens of proof are commonly applied to factual findings, *id.* at 1164; (2) the Maryland Legislature had provided for automatic review by the court of appeals of the jury's

---

[10]Nunnery understandably does not suggest that this factual finding is subject to the beyond-a-reasonable-doubt standard. Because the finding of mitigating circumstances does not increase the maximum punishment that is available, *Ring* is of no relevance to that finding.

death sentence for ''sufficiency of the evidence,'' indicating that the legislature did not view the weighing determination as a ''purely judgmental choice'' since appellate review of the sufficiency of the evidence is the traditional review for findings of fact, *id.* at 1165; and (3) the repeated use of the word ''find'' in the Maryland statute ''suggests the determination of an observable fact,'' *id.* at 1163. The Nevada statutes, however, do not reflect the same considerations that convinced the dissenter in *Oken* that weighing involved a factual determination. First, the Nevada Legislature did not specify any burden of proof for the weighing determination. *See* NRS 175.554(3), (4); NRS 200.030(4)(a). Second, although the Nevada Legislature has provided for automatic review of a death sentence by this court, it has required this court to consider the sufficiency of the evidence with respect to the aggravating circumstances, not with respect to the death sentence in general or the weighing determination in particular. *See* NRS 177.055(2). And third, while NRS 175.554(3) uses the word ''finds'' when referring to the weighing determination, that word does not appear in the other two statutory provisions that address the weighing determination (NRS 175.554(4) and NRS 200.030(4)(a)), and one of those provisions (NRS 175.554(4)) requires that the verdict identify the aggravating circumstances ''found'' and ''*state* that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance[s].'' (Emphasis added.) Nevada's statutory scheme therefore provides no support for the conclusion that the weighing determination involves fact-finding.

Other courts have held that the weighing determination does not involve fact-finding, focusing on the moral or judgmental character of the weighing determination as support.[11] They reason that '' 'the weighing process is not a fact-finding one based on evidence' '' but is instead '' 'purely a judgmental one, of balancing the mitigator(s) against the aggravator(s) to determine whether death is

---

[11]Courts have reached this conclusion in cases decided both before and after *Apprendi* and *Ring*. For examples of cases decided before *Apprendi/Ring*, *see Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir. 1983) (''While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard the relative *weight* is not.'' (citation omitted)); *Gerlaugh v. Lewis*, 898 F. Supp. 1388, 1421 (D. Ariz. 1995); and *Bonin v. Vasquez*, 807 F. Supp. 589, 621 (C.D. Cal. 1992) (''The existence of a fact can be demonstrated at different standards of proof,'' but the weighing of aggravating and mitigating factors ''is not susceptible to proof by either party.'' (quotation omitted)). For examples of cases decided after *Apprendi/Ring*, *see Higgs v. U.S.*, 711 F. Supp. 2d 479, 539 (D. Md. 2010); *Ex parte Waldrop*, 859 So. 2d 1181, 1189 (Ala. 2002); *Ritchie v. State*, 809 N.E.2d 258, 265 (Ind. 2004); *Oken v. State*, 835 A.2d 1105, 1151 (Md. 2003); and *State v. Fry*, 126 P.3d 516, 534 (N.M. 2005).

the appropriate punishment in the particular case.'" *Oken*, 835 A.2d at 1151 (quoting *Borchardt v. State*, 786 A.2d 631, 652 (Md. 2001)); *see also Higgs v. U.S.*, 711 F. Supp. 2d 479, 540 (D. Md. 2010) (explaining that weighing determination "is a *normative* question rather than a *factual* one" because when weighing aggravating and mitigating circumstances, jurors "draw upon their sense of community norms in light of the totality of circumstances surrounding the criminal and the crime" whereas "in order to find a first-order fact to be true, the jurors must evaluate the evidence presented to determine whether they believe in the truth of the fact beyond any reasonable doubt"); *Ex parte Waldrop*, 859 So. 2d 1181, 1189 (Ala. 2002) ("[T]he weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum."). This court used similar reasoning in *McConnell III*, relying on pre-*Apprendi/Ring* Supreme Court decisions. 125 Nev. at 254, 212 P.3d at 315 ("As the United States Supreme Court has stated, the jury's decision whether to impose a sentence of death is a moral decision that is not susceptible to proof." (citing *Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Caldwell v. Mississippi*, 472 U.S. 320 (1985))); *see also Leonard v. State*, 114 Nev. 1196, 1216, 969 P.2d 288, 300 (1998) ("The weighing of the aggravating and mitigating circumstances is not mathematical . . . .").

Further support for this view of the weighing determination as a moral determination rather than a factual determination can be found in the definition of "fact." "Fact" has been defined as "[a] thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence; an actual happening in time space or an event mental or physical; that which has taken place." *Black's Law Dictionary* 531-32 (5th ed. 1979). The weighing determination does not involve the finding of any facts; instead, weighing asks the sentencing body to balance facts that have already been found (aggravating and mitigating circumstances) in order to reach a conclusion or judgment. *See Webster's Ninth New Collegial Dictionary* 1337 (1983) (defining "weigh" as "to consider carefully esp. by balancing opposing factors or aspects in order to reach a choice or conclusion").

In our estimation, our decision in *McConnell III* and those of other courts concluding that the weighing determination is not a factual finding present the better-reasoned view. We therefore conclude that the weighing of aggravating and mitigating circumstances is not a fact-finding endeavor and disavow any prior lan-

guage suggesting otherwise.[12] Accordingly, the district court did not err in refusing to give the requested instruction.[13]

### Inconsistent descriptions of the weighing determination

Nunnery's requested instruction was properly rejected for an additional reason: it did not correctly state the weighing determination required by the Nevada statutes. Nunnery requested an instruction stating that death eligibility was contingent on the aggravating circumstances outweighing the mitigating circumstances. This misstated the statutory requirement, which is that "there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found." NRS 175.554(3), (4); *see also* NRS 200.030(4). Nunnery is not alone in this, as the same misstatement has occasionally appeared in our opinions. *See, e.g., Witter*, 112 Nev. at 923, 921 P.2d at 896; *McKenna v. State*, 101

---

[12]In some instances, this court has used language that places a "burden" on the State with respect to the weighing of aggravating and mitigating circumstances. *See, e.g., Gallego v. State*, 117 Nev. 348, 365-66, 23 P.3d 227, 239 (2001) ("To obtain a death sentence, the State must prove beyond a reasonable doubt that at least one aggravating circumstance exists and that the aggravating circumstance or circumstances outweigh any mitigating evidence."); *Witter v. State*, 112 Nev. 908, 923, 921 P.2d 886, 896 (1996) ("[W]e read NRS 200.030(4) as stating that the death penalty is an available punishment only if the [S]tate can prove beyond a reasonable doubt at least one aggravating circumstance exists, and that the aggravating circumstance or circumstances outweigh the mitigating evidence offered by the defendant."), *receded from on other grounds by Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000). To the extent that those decisions could be read as support for the conclusion that the weighing determination involves fact-finding because burdens of proof are typically reserved for factual determinations, we clarify that this was not the court's intent and disavow any language in *Witter* and its progeny as to any burden of proof related to the weighing determination.

[13]Nunnery suggests that this holding brings into question the continuing validity of this court's authority to "reweigh" aggravating and mitigating circumstances on appeal after invalidating an aggravating circumstance. Reasoning that if weighing involves a moral judgment rather than fact-finding, "it is not possible for this Court to say with any kind of certainty that a juror would have reached the same conclusion in the absence of an invalid aggravating circumstance," Nunnery asks us to overrule *Canape v. State*, 109 Nev. 864, 859 P.2d 1023 (1993), to the extent that it allows appellate reweighing. We need not resolve this issue here because the jury did not consider any invalid aggravating circumstances, and we thus are not called upon to reweigh in this case. Nonetheless, we note that Nunnery has provided no support for his argument and that courts had characterized the weighing determination as a moral judgment before *Apprendi/Ring*, *see, e.g., Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir. 1983), but that characterization does not appear to have brought into question the propriety of appellate reweighing or harmless-error review before or after *Apprendi/Ring*.

Nev. 338, 349 & n.14, 705 P.2d 614, 621 & n.14 (1985). This misstatement of the weighing determination is of no consequence in most instances because a conclusion that there are no mitigating circumstances sufficient to outweigh the aggravating circumstances generally equates to a conclusion that the aggravating circumstances outweigh the mitigating circumstances. The difference is of consequence, however, in the theoretical 50-50 case, where the mitigating and aggravating circumstances are of equal weight. Under the statutory articulation, the death penalty is still available in the 50-50 case because the mitigating circumstances are not sufficient to *outweigh* the aggravating circumstances. *See Ybarra v. State*, 100 Nev. 167, 173-76, 679 P.2d 797, 801-03 (1984) (discussing outcome of 50-50 case under Nevada's statutory scheme). The opposite is true under Nunnery's articulation—the death penalty would be removed as a sentencing option in the 50-50 case because the aggravating circumstances do not *outweigh* the mitigating circumstances. We take this opportunity to disavow any language in our prior decisions that is inconsistent with the statutory articulations of the weighing calculus. *See* NRS 175.554(3), (4); NRS 200.030(4)(a).[14]

---

[14]Nunnery suggests that the statutory weighing calculus violates equal protection based on our inconsistent articulations of it. *Compare Evans v. State*, 117 Nev. 609, 634, 28 P.3d 498, 515 (2001), *with Witter*, 112 Nev. at 923, 921 P.2d at 896. Despite our inconsistent articulations of the weighing calculus, the statutory articulation has remained the same. *See* NRS 200.030(4); NRS 175.554(3). And where, as here, the jury was improperly instructed that the aggravating circumstances had to outweigh the mitigating circumstances, the error inures to the defendant's benefit. *See Ybarra*, 100 Nev. at 173-76, 679 P.2d at 801-03. We perceive no equal protection violation.

We have reviewed Nunnery's other assignments of error related to the penalty-phase jury instructions and conclude that they lack merit. The district court adequately instructed the jury on mitigating circumstances and the instructions proffered by Nunnery were largely duplicitous or unnecessary. And the district court did not err in failing to instruct the jury that the mitigating circumstances did not have to be found beyond a reasonable doubt where there was nothing in the instructions to suggest that the mitigating circumstances were subject to such a burden, there was no argument offered to that effect, and the instructions explicitly applied the beyond-a-reasonable-doubt standard to the aggravating circumstances but did not attach that requirement to the mitigating circumstances. *Cf. Jimenez v. State*, 112 Nev. 610, 624-25, 918 P.2d 687, 695-96 (1996) (applying similar analysis to claim that trial court erred in failing to instruct jury that mitigating circumstances did not have to be found unanimously). Nunnery offers no authority that would require the court to instruct the jury to conduct a second weighing determination and reconsider its decision on death eligibility during the second phase of the penalty hearing, and we therefore decline to consider his claim regarding the trial court's refusal to give such an instruction. *See Maresca v. State*, 103 Nev. 669, 748 P.2d 3 (1987). Finally, the district court was not required to give the jury an *Allen* charge before deliberations, *see Allen v. United States*, 164 U.S. 492,

### The great-risk-of-death-to-more-than-one-person aggravator

Nunnery claims that the district court erred by allowing the State to seek the "great risk of death to more than one person" aggravator[15] on four grounds: (1) the State did not provide timely notice of the aggravator, (2) the aggravator was based upon the imputed conduct of Nunnery's codefendants, (3) the notice of intent failed to include sufficient factual information, and (4) there is insufficient evidence to support the aggravator. Each of Nunnery's claims lacks merit.

### Untimely notice of evidence in aggravation

Nunnery claims that the district court should not have permitted the great-risk-of-death aggravator because he was not given timely notice of the evidence supporting it. As discussed above, the notice of evidence in aggravation in this case was filed three days late. Nunnery acknowledges that he was not prejudiced with regard to the other aggravators because the notices of evidence previously filed in his other cases were duplicative. However, he points out that because the great-risk-of-death aggravators in his other cases were based on the specific facts of those separate crimes, the evidence used to support the aggravator in this case was unique and thus not timely disclosed. We conclude that no relief is warranted.

The notice of intent to seek the death penalty, which was filed more than a year before trial, informed Nunnery that the great-risk-of-death aggravator was based on the fact that Nunnery committed a robbery and fired shots at several victims in a public place. All of the evidence supporting the aggravator was admitted at the guilt phase of trial. He does not allege that any of the guilt-phase witnesses were untimely noticed or that he was unaware of their intended testimony. Therefore, he fails to show that the late notice of evidence in aggravation prejudiced him in his defense of the great-risk-of-death aggravator.

---

501 (1896); *Wilkins v. State*, 96 Nev. 367, 372-73, 609 P.2d 309, 312-13 (1980), because such an instruction is intended to address deadlocked juries and is only appropriately used when "absolutely necessary," *Staude v. State*, 112 Nev. 1, 6, 908 P.2d 1373, 1377 (1996), *modified on other grounds by Richmond v. State*, 118 Nev. 924, 930-32, 59 P.3d 1249, 1253-54 (2002). There was no deadlocked jury in this case and therefore no need for an *Allen* charge.

[15]NRS 200.033(3) states that a murder is aggravated when a person "knowingly create[s] a great risk of death to more than one person by means of a weapon, device[,] or course of action which would normally be hazardous to the lives of more than one person."

*Theories of imputed liability*

Nunnery claims that the district court erred by allowing the State to base the great-risk-of-death aggravator on a theory of accomplice liability because the State's notice of intent did not specify that theory.[16] Nunnery's claim is without merit.

SCR 250(4)(c) states that a notice of intent to seek the death penalty "must allege all aggravating circumstances which the state intends to prove and allege with specificity the facts on which the state will rely to prove each aggravating circumstance." This means that a defendant should not have to gather facts to deduce the State's theory for an aggravating circumstance; the supporting facts must be stated directly in the notice itself. *Hidalgo v. Dist. Ct.*, 124 Nev. 330, 337, 184 P.3d 369, 375 (2008).

In this case, the State's notice of intent alleged the "great risk of death to more than one person" aggravator based upon Nunnery's repeated firing of his weapon in a public place near numerous bystanders. The notice of evidence in aggravation described the same facts but stated that "the gunfire by Nunnery *and his codefendants* created a great risk of death to more than one person." (Emphasis added.) Based partly on this added language, Nunnery objected to the use of accomplice liability to support the aggravator.

The district court did not err in overruling Nunnery's objection because the State did not seek the great-risk-of-death aggravator based on a theory of imputed liability. The description of the course of action taken by Nunnery and his codefendants included in the notice of evidence in aggravation did not suggest a "change of theory" to accomplice liability for the aggravator; rather, the description elucidated the State's theory that Nunnery's course of conduct created a risk of death to multiple persons. Although the prosecutor argued in closing that the jury could consider "the collected behavior of all four individuals," the prosecutor told the jury it could do so only because Nunnery was the group's leader and chose the time and location of the crime. The descriptions of the conduct of Nunnery's codefendants included in the notice of evidence in aggravation were not an attempt to base the aggravator

---

[16]Nunnery also claims that the district court erred by permitting aggravating circumstances based on imputed liability. However, Nunnery fails to explain how the other five aggravators (four prior violent felony convictions and a felony-murder aggravator based on robbery) were based on theories of imputed liability rather than his own actions. Therefore, we limit our discussion here to the great-risk-of-death aggravator.

solely on the codefendants' conduct but to show how Nunnery was responsible for directing a course of events that placed numerous innocent people at a high risk of death.

### Insufficient detail in notice of intent to seek the death penalty

Nunnery claims that the great-risk-of-death aggravator should have been stricken because the notice of intent to seek the death penalty did not specify that the aggravator was based on allegations that other persons were present near the crime scene when the shootings occurred. Our review of the notice of intent demonstrates otherwise; the notice of intent states that the aggravator was based on the crimes committed by the defendant in a location "which the public has access to and which several citizens are located nearby."

### Sufficiency of the evidence

Nunnery's final challenge to this aggravator is that there is insufficient evidence to support it. The evidence presented at trial, however, showed that Nunnery chose the victims and the location of the armed robbery and fired his gun repeatedly and at multiple victims while numerous people, including children, were waiting at the nearby bus stop, walking on the sidewalk, and standing on the balconies of the apartment complex where the shootings occurred. This evidence was sufficient for a rational juror to find beyond a reasonable doubt that Nunnery knowingly created a great risk of death to others as contemplated by NRS 200.033(3).

### Evidence of fetal alcohol syndrome

Nunnery sought to bolster his case for mitigation based on fetal alcohol syndrome through statements attributed to his cousin, Willie Nunnery, Jr. According to a defense investigator, Willie said that Nunnery's mother drank alcohol throughout her pregnancy and that Nunnery was small, wrinkly, and jittery when he was born, probably prematurely. The defense asked the district court to allow the defense investigator to testify to what Willie had told her when she interviewed him at a detention center in southern California. The district court refused to admit the evidence because it lacked credibility. Nunnery takes issue with that evidentiary decision.

Although "evidence which may or may not ordinarily be admissible under the rules of evidence," such as the hearsay testimony offered by Nunnery's defense investigator, "may be admitted in the penalty phase of a capital trial," the evidence is not admissible if it is "supported solely by impalpable or highly sus-

pect evidence.'' *Homick v. State*, 108 Nev. 127, 138, 825 P.2d 600, 607 (1992). The record demonstrates that the evidence offered here is highly suspect: (1) neither of Nunnery's siblings remembered a cousin named Willie; (2) Willie's claim that he had lived with the family when Nunnery was born was unsupported; (3) Willie would have been only ten years old at the relevant time; (4) other witnesses who were adults at the time did not testify that Nunnery had any medical problems when he was born; (5) evidence at trial had proven that other stories about Nunnery's mother were untrue (*e.g.*, Nunnery and his siblings had been told their mother had been raped and killed when in fact she died from an overdose); and (6) the defense investigator had been unable to acquire Nunnery's birth records or any other documentation showing that Nunnery's mother drank or used drugs while pregnant or verifying that Nunnery had health problems when he was born. Based on the record and the district court's findings, we cannot conclude that the district court abused its discretion in excluding the defense investigator's proffered testimony. *See Harte v. State*, 116 Nev. 1054, 1069, 13 P.3d 420, 430 (2000).

### *Juror misconduct*

Nunnery claims that the district court erred by failing to conduct a hearing to inquire into alleged juror misconduct and declare a mistrial based on the misconduct. Our review of the record indicates that the district court conducted an adequate inquiry into the alleged misconduct, hearing testimony from an attorney who overheard several jurors commenting that a defense expert was boring and had put them to sleep. The defense did not ask the court to question any specific jurors; rather, counsel suggested he was only making a record in consideration of Nunnery's future allegations of ineffective assistance of counsel. Under the circumstances, we cannot conclude that the district court's inquiry was inadequate. *See Viray v. State*, 121 Nev. 159, 163, 111 P.3d 1079, 1082 (2005) (explaining that in exercising discretion to remove a juror for violating an admonishment rather than declaring a mistrial, ''a district court must conduct a hearing to determine if the violation of the admonishment occurred and whether the misconduct is prejudicial to the defendant''). Moreover, the allegations of juror misconduct were insufficient to warrant a mistrial. The jury had already deliberated twice (during the guilt phase and the first phase of the penalty hearing), and the second phase of the penalty hearing was almost complete. Although the jurors' familiarity appears to have contributed to a lapse in strict compliance with the court's admonitions not to talk among themselves on any subject related to the case, *see* NRS 175.401, we agree with the district court that their comments that an expert's testimony was long and

boring were insufficient to demonstrate prejudice that would warrant a mistrial. *See Meyer v. State*, 119 Nev. 554, 565, 80 P.3d 447, 456 (2003) (explaining that defendant must demonstrate prejudice based on intrinsic jury misconduct and that "only in extreme circumstances will intrinsic misconduct justify a new trial"). There was no abuse of discretion in denying the motion. *See id.* at 561-62, 80 P.3d at 453 (stating that denial of motion for new trial based on juror misconduct is reviewed for abuse of discretion but that prejudicial effect of misconduct will be reviewed de novo "where *the misconduct involves allegations that the jury was exposed to* extrinsic evidence in violation of the Confrontation Clause'').

### Jury's rejection of mitigating evidence

Nunnery claims that his death sentence must be reversed because the jury acted arbitrarily and capriciously in rejecting mitigating circumstances that were clearly proven by the evidence. Specifically, Nunnery claims that the jury should have found the following mitigating circumstances: (1) he was abused by his father, (2) he assumed responsibility for his siblings, (3) he moved to multiple residences before the age of 16 and lacked a stable living environment, and (4) he accepted responsibility and admitted to the crimes. We cannot agree with, and have previously rejected, the premise that jurors are required to find proffered mitigating circumstances simply because there is unrebutted evidence to support them. *See, e.g.*, *Gallego v. State*, 117 Nev. 348, 366-67, 23 P.3d 227, 240 (2001); *Hollaway v. State*, 116 Nev. 732, 744, 6 P.3d 987, 995-96 (2000); *Thomas v. State*, 114 Nev. 1127, 1149, 967 P.2d 1111, 1125 (1998). Nevada law permits the jury to decide, even if the evidence supports the factual basis for a mitigating circumstance, that the proposed mitigating circumstance does not actually extenuate or reduce the defendant's moral culpability. In this case, the jury found 11 mitigating circumstances. Its failure to find all of the proffered mitigating circumstances did not deprive Nunnery of his constitutional rights.

### Constitutionality of the death penalty

Nunnery claims that the death penalty is unconstitutional because (1) Nevada's death penalty scheme does not narrow the class of persons eligible for the death penalty, (2) it constitutes cruel and unusual punishment, and (3) executive clemency is unavailable. We have previously rejected similar challenges to the death penalty. *See, e.g.*, *Thomas v. State*, 122 Nev. 1361, 1373, 148 P.3d 727, 735-36 (2006) (reaffirming that Nevada's death penalty statutes sufficiently narrow the class of persons eligible for

the death penalty); *Colwell v. State*, 112 Nev. 807, 812-15, 919 P.2d 403, 406-08 (1996) (rejecting claims that Nevada's death penalty scheme forecloses executive clemency or violates the Eighth Amendment).

*Guilt-phase claims*

*Jury selection*

Nunnery claims that the district court erred by permitting a peremptory challenge of the only African-American potential juror who was not dismissed for cause in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and by dismissing three other potential jurors for cause. Nunnery's claims lack merit.

*Peremptory challenge*

An equal-protection challenge to the exercise of a peremptory challenge is evaluated using the three-step analysis adopted by the United States Supreme Court in *Batson. Kaczmarek v. State*, 120 Nev. 314, 332, 91 P.3d 16, 29 (2004); *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995) (summarizing three-step *Batson* analysis). First, "the opponent of the peremptory challenge must make out a prima facie case of discrimination." *Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006). Next, "the production burden then shifts to the proponent of the challenge to assert a neutral explanation for the challenge." *Id.* Finally, "the trial court must then decide whether the opponent of the challenge has proved purposeful discrimination." *Id.* We review the district court's ruling on a *Batson* challenge for an abuse of discretion. *See Thomas v. State*, 114 Nev. 1127, 1136-37, 967 P.2d 1111, 1117-18 (1998); *Washington v. State*, 112 Nev. 1067, 1071, 922 P.2d 547, 549 (1996).

Here, the State exercised its first peremptory challenge to dismiss potential juror Besse, an African American. After all challenges had been exercised, the district court asked whether there were any objections. Defense counsel stated that "in an abundance of caution," he needed to make a record that striking Besse left no African Americans on the jury panel. The district court then inquired as to the State's reasons for removing the juror. In response, the prosecutor pointed to the juror's feelings about the death penalty and asked that his juror questionnaire be made part of the record. The district court then asked whether defense counsel had "anything else," receiving a brief "no" in response. The district court then found that there was "no pattern here."

Although the district court should have made a clearer statement of its reasoning on the third step of the *Batson* analysis as to juror Besse (whether the defense had proven purposeful discrimination),

*see Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30, we cannot conclude that the district court abused its discretion based on this record. The State offered a facially race-neutral explanation for the peremptory challenge—the juror's views on the death penalty. At the time, the defense did not challenge the State's explanation as a pretext for racial discrimination, but on appeal Nunnery suggests that the State's discriminatory intent is apparent based on comparative juror analysis, which we have recognized may be circumstantial evidence probative of a prosecutor's intent, *Ford*, 122 Nev. at 405, 132 P.3d at 578-79. Setting aside Nunnery's failure to bring this comparative juror analysis to the trial court's attention,[17] it does not demonstrate purposeful discrimination.

Nunnery compares Besse's views on the death penalty with those of juror Vazquez, whom the State did not challenge; he asserts that the two jurors had similar views and therefore the State's failure to remove juror Vazquez demonstrates that its reason for removing juror Besse was a pretext for purposeful discrimination against African-American jurors. The record does not support Nunnery's comparison. The juror questionnaire used in this case asked whether the juror's beliefs were such that the juror would automatically vote against the death penalty regardless of the facts and circumstances of the case and whether the juror could consider all four forms of punishment in a murder case. In his juror questionnaire, Besse marked ''yes'' in response to the first question and wrote ''no'' in response to the second question. Besse gave a conflicting answer during voir dire, indicating that he could vote for the death penalty if it fit the crime. In contrast, juror Vazquez indicated in his juror questionnaire that he would not automatically vote against the death penalty and that he could consider all four forms of punishment. His responses during voir dire were consistent with the responses on the questionnaire, although he indicated some unwillingness to be the foreperson in a capital case. Given Vazquez's consistent representations that he could consider all

---

[17]It is not entirely clear whether an appellate court is required to conduct a comparative juror analysis for the first time on appeal, but out of an abundance of caution, we do so here, keeping in mind the inherent limitations in reviewing such a claim for the first time based on the cold appellate record. *See generally People v. Lenix*, 187 P.3d 946, 960-62 (Cal. 2008) (concluding that prior practice of refusing to engage in comparative juror analysis for first time on appeal ''unduly restricts review based on the entire record'' but acknowledging that ''comparative juror analysis on a cold appellate record has inherent limitations'' that must be taken into consideration); *id.* at 968 (Baxter, J., concurring) (observing that ''Supreme Court has not yet addressed whether a state court may deem a defendant procedurally barred on appeal from relying on juror comparisons to support a [*Batson*] third stage claim, if the defendant did not rely on such comparisons at trial,'' but given that lack of clarity, the best course is to ''perform comparative juror analysis if requested and if the record is adequate to permit comparisons, even when such an analysis was not conducted at trial'').

penalties and Besse's conflicting representations about his willingness to vote for a death sentence, the comparison does not demonstrate that the State's challenge was improperly based on race. The district court therefore did not abuse its discretion.

### Challenges for cause

Nunnery further claims that the district court erred by dismissing three potential jurors for cause based on their views concerning the death penalty. "Great deference is afforded to the district court in ruling on challenges for cause," *Browning v. State*, 124 Nev. 517, 530, 188 P.3d 60, 69 (2008), and this court will uphold a dismissal for cause where it appears that a potential "juror's opposition to the death penalty would have prevented or substantially impaired the performance of his duties as a juror," *id.* at 531, 188 P.3d at 70; *accord Wainwright v. Witt*, 469 U.S. 412, 424 (1985). The potential jurors at issue here unequivocally expressed in their jury questionnaires and during voir dire that they could not give meaningful consideration to the death penalty. Given the jurors' steadfast refusal to consider the death penalty, we defer to the district court.

### Motion for mistrial

Nunnery claims that the district court erred by denying a motion for mistrial after the prosecution's examination of a detective implied that Nunnery had been involved in other homicides. In the challenged examination, the prosecutor asked the detective about Nunnery's statement, "I'm the last one. I'm the one who *always* cleaned up. I'm the clean up." (Emphasis added.) Although this language could reasonably be interpreted to imply that Nunnery had been involved in other crimes, like the district court, we are not convinced that this language conveyed that Nunnery had been involved in other homicides. Under the circumstances and given the brevity and vagueness of the language, we cannot conclude that Nunnery has made the clear showing of an abuse of discretion that would be required to overturn the district court's decision to deny the motion for a mistrial. *Randolph v. State*, 117 Nev. 970, 981, 36 P.3d 424, 431 (2001) ("Denial of a motion for mistrial is within the district court's sound discretion, and this court will not overturn a denial absent a clear showing of abuse.").

### Guilt-phase jury instructions

Nunnery claims that several jury instructions given at the guilt phase of his trial lessened the State's burden of proof because each

instruction did not independently advise the jury that the State had the burden to prove each element of every crime beyond a reasonable doubt. Specifically, Nunnery challenges instructions containing phrases such as "must be proven beyond a reasonable doubt," "[i]t is sufficient that each of you find beyond a reasonable doubt," and "[i]f you are convinced beyond a reasonable doubt," because these phrases do not include language reiterating that the State bears the burden of proof. Because three other instructions informed the jury that the State bore the burden of proof and the same need not be stated in every instruction, we conclude that the district court did not abuse its discretion. *See Higgs v. State*, 126 Nev. 1, 21, 222 P.3d 648, 661 (2010) (stating that decision to give or reject jury instructions is reviewed for "an abuse of discretion or judicial error").

Nunnery also argues that one jury instruction was improper because it stated that the State had the burden of "proving beyond a reasonable doubt every material element of the crime charged" without specifying the elements that are material. This court has repeatedly upheld such language. *See, e.g., Morales v. State*, 122 Nev. 966, 971, 143 P.3d 463, 466 (2006); *Crawford v. State*, 121 Nev. 744, 751, 121 P.3d 582, 586 (2005); *Gaxiola v. State*, 121 Nev. 638, 650, 119 P.3d 1225, 1233 (2005); *Leonard v. State*, 114 Nev. 1196, 1209, 969 P.2d 288, 296 (1998). Therefore, the district court did not abuse its discretion in giving this instruction. *See Higgs*, 126 Nev. at 21, 222 P.3d at 661.

### Sufficiency of the evidence

Nunnery claims that there was insufficient evidence to support his conviction for the attempted murder of Leobardo Ledesma and/or Victor Ambriz-Nunez. " '[A]fter viewing the evidence in the light most favorable to the prosecution,' " we conclude that " '*any* rational [juror] could have found the essential elements of the crime beyond a reasonable doubt.' " *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Nunnery was charged with the attempted murder of Ambriz-Nunez and/or Ledesma under the alternative theories that he directly committed the crime or aided and abetted in its commission. Nunnery does not dispute that his codefendants fired their guns at Ambriz-Nunez and Ledesma but instead argues that because he did not shoot at them or "yell at, encourage, or otherwise direct his codefendants" to do so, there is no evidence that he had the specific intent to kill them, which is required for a conviction of attempted murder, *see Sharma v. State*, 118 Nev. 648, 56 P.3d 868

(2002). The record shows otherwise. Nunnery confessed to planning the crime, which included directing his companions to bring their guns, loading his gun with two types of ammunition in an effort to confuse the police, and choosing the victims. He also admitted to shooting two of the victims (Nunez and Leon) in the head with the intention of killing them. Based on this evidence, a rational juror could conclude beyond a reasonable doubt that Nunnery either attempted to kill Ledesma and Ambriz-Nunez or aided and abetted his companions with the intent that they kill Ledesma and Ambriz-Nunez. The fact that Nunnery was focused on killing two individuals while his companions shot at others does not preclude a jury from finding that he had the intent that all of the victims be killed. The jury's verdict is supported by sufficient evidence.[18]

*Mandatory review of the death sentence pursuant to NRS 177.055(2)*

We are required by statute to review every death sentence and determine whether (1) "the evidence supports the finding of an aggravating circumstance or circumstances"; (2) "the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor"; and (3) "the sentence of death is excessive, considering both the crime and the defendant." NRS 177.055(2)(c)-(e). After doing so here, we affirm the death sentence.

First, we conclude that the evidence supports the finding of six aggravating circumstances: (1) Nunnery had a prior violent felony conviction for the attempted murder of Cesar Leon,[19] (2) Nunnery had a prior violent felony conviction for the attempted murder of Victor Ambriz-Nunez and/or Leobardo Ledesma, (3) Nunnery had a prior violent felony conviction for the armed robbery of Cesar Leon, (4) Nunnery had a prior violent felony conviction for the attempted robbery of Leobardo Ledesma, (5) Nunnery knowingly created a great risk of death to more than one person, and (6) the murder was committed while Nunnery was engaged in the commission of a robbery. All six aggravating circumstances were based on the circumstances of the crime, to which Nunnery confessed. In particular, Nunnery admitted to robbing and shooting at Cesar Leon, trying to rob the other victims, and to murdering Saul Nunez during the robbery. And while Nunnery challenges the evidence supporting the aggravating circumstances for

---

[18]Having considered the relevant factors, *see Big Pond v. State*, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985), we reject Nunnery's claim of cumulative error.

[19]All four prior violent felony convictions included weapon enhancements.

the attempted murder of Ambriz-Nunez and/or Ledesma and for creating a great risk of death to more than one person, we concluded above that sufficient evidence supports them. The State proved all six aggravating circumstances beyond a reasonable doubt.

Second, nothing in the record demonstrates that the jury's verdict was the result of passion, prejudice, or any other arbitrary factor. Despite Nunnery's claims that his penalty hearing was unfair on the grounds outlined in this opinion, no error unduly prejudiced him or served to inflame the jury.

Finally, we must consider whether the death sentence is excessive. In doing so, we "consider[ ] only the crime and the defendant at hand," *Dennis v. State*, 116 Nev. 1075, 1084, 13 P.3d 434, 440 (2000), to determine whether "the crime and defendant . . . [are] of the class or kind that warrants the imposition of death," *id.* at 1085, 13 P.3d at 440. The evidence presented at the penalty hearing revealed that in three separate incidents within a matter of weeks Nunnery murdered three people. Nunnery was shown to be a violent man with little regard for human life and without any remorse for his actions. The record demonstrates that Nunnery committed a cold-blooded and unprovoked killing and has a propensity toward violent behavior. We conclude that the death sentence in this case is not excessive.

## CONCLUSION

Our review of this appeal reveals no errors that would warrant a new trial, either guilt phase or penalty phase. Accordingly, we affirm the judgment of conviction.

SAITTA, C.J., and DOUGLAS, GIBBONS, PICKERING, HARDESTY, and PARRAGUIRRE, JJ., concur.